Chester A. WILK, D.C., et al.,
Plaintiffs,

v.

AMERICAN MEDICAL ASSOCIATION,
et al., Defendants.

Civ. A. No. 76 C 3777.

United States District Court,
N.D. Illinois, E.D.

Sept. 25, 1987.

George P. McAndrews, Timothy J. Malloy, Robert C. Ryan, Robert H. Resis, Audrey A. Horton, Allegretti, Newitt, Witcoff & McAndrews, Ltd., Paul E. Slater, Sperling, Slater & Spitz, Chicago, Ill., for plaintiffs.

Max E. Wildman, Douglas R. Carlson, Gary Dyal, Wildman, Harrold, Allen & Dixon, Jack R. Bierig, Sidley & Austin, Kirk Johnson, B.J. Anderson, William J. Tabor, American Medical Ass'n, Chicago, Ill., for American Medical Ass'n ("AMA").

Michael Anthony, Linda A. Tomaselli, American Hosp. Ass'n, Lawrence Manson, Andrew David, Chicago, Ill., for American Hosp. Ass'n ("AHA").

Paul G. Gebhard, Allan E. Lapidus, Douglas Polk, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for American College of Surgeons ("ACS").

Phil C. Neal, Ralph Russell, Neal, Gerber & Eisenberg, Chicago, Ill., for American College of Physicians ("ACP").

Daniel M. Schuyler, James L. Simon, Schuyler, Roche & Zwirner, Harold J. Bressler, Eleanor Wagner, Joint Com'n on Accreditation of Hospitals, Chicago, Ill., for Joint Com'n on Accreditation of Hospitals ("JCAH").

James A. Cherney, Ken Goodsmith, Latham & Watkins, Chicago, Ill., for American College of Radiology ("ACR").

Perry L. Fuller, Robert E. Nord, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for American Academy of Orthopaedic Surgeons ("AAOS").

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This antitrust case is on remand for a new trial from the Court of Appeals, *Wilk v. AMA*, 719 F.2d 207 (7th Cir.1983) (*"Wilk"*). On May 4, 1987 the case was reassigned to me under Local Rule 2.30e for the purpose of conducting the trial. The trial was conducted during May and June of 1987. The record consists of 3,624 pages of transcript, approximately 1,265 exhibits, and excerpts from 73 depositions.

On August 27, 1987, the Court issued a memorandum opinion containing written findings of fact and conclusions of law under Rule 52 of the Fed.R.Civ.P. Thereafter, two of the defendants, the American College of Surgeons and the American College of Radiology settled the case with the plaintiffs and I granted motions to amend the memorandum opinion of August 27th. In the present opinion I have made those changes, plus additional editorial changes, and have included citations to the record supplied, at my request, by plaintiff's counsel but checked by me.

### I. *The First Trial and the Wilk Decision*

The plaintiffs, Chester A. Wilk, James W. Bryden, Patricia B. Arthur, and Michael D. Pedigo, are licensed chiropractors. In a complaint filed in 1976, plaintiffs charged the defendants with violating Sections 1 and 2 of the Sherman Act, 15 U.S.C. Sections 1 and 2. Section 1 of the Sherman Act declares illegal every contract, combination or conspiracy in restraint of trade or commerce. Section 2 prescribes penalties for every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce. The original defendants were the American Medical Association ("AMA"), the American Hospital Association ("AHA"), the American College of Surgeons ("ACS"), the Joint Commission on Accreditation of Hospitals ("JCAH"), the American College of Physicians ("ACP"), the American College of Radiology ("ACR"), the American Academy of Orthopaedic Surgeons ("AAOS"), American Osteopathic Association ("AOS"), American Academy of Physical Medicine and Rehabilitation ("AAPMR"), Illinois State Medical Society ("ISMS"), Chicago Medical Society ("CMS"), The Medical Society of Cook County ("MSCC"), H. Doyl Taylor, Dr. Joseph A. Sabatier, Jr., M.D., Dr. H. Thomas Ballantine, M.D., and James H. Sammons,

M.D.[1] A number of the original defendants settled the case and have been dismissed, and all of the original individual defendants except Dr. Sammons obtained summary judgment prior to the retrial of this case. Thus, the defendants which remain in the case are the AMA, JCAH and AAOS.

At the first trial, the plaintiffs' principal claim was that the defendants engaged in a conspiracy to eliminate the chiropractic profession by refusing to deal with the plaintiffs and other chiropractors. Plaintiffs claimed that the boycott was accomplished through the use of Principle 3 of the AMA's Principles of Medical Ethics ("AMA's Principles") which prohibited medical physicians from associating professionally with unscientific practitioners. Principle 3 provided as follows:

A physician should practice a method of healing founded on a scientific basis; and he should not voluntarily professionally associate with anyone who violates this principle.

It was the plaintiffs' contention that the AMA used Principle 3 to achieve a boycott of chiropractors by first calling chiropractors "unscientific practitioners," and then advising AMA members and other medical societies that it was unethical for medical physicians to associate with chiropractors. The other defendants, plaintiffs claimed, joined the boycott and the result was a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act. The jury returned a verdict for the defendants and against the plaintiffs. That judgment was reversed on appeal and the case was remanded.

The *Wilk* Court clarified the principal legal issues in the case. The Court held that the legality of the defendants' conduct under Section 1 must be adjudged under the rule of reason articulated in *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). The Court rejected the plaintiffs' argument that the defendants' conduct was a per se violation of Section 1, holding that "a canon of medical ethics purporting,

surely not frivolously, to address the importance of scientific method gives rise to questions of sufficient delicacy and novelty at least to escape per se treatment." 719 F.2d at 222. Under the rule of reason, the inquiry mandated is whether the challenged agreement is one that promotes competition or one that suppresses competition. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).

The Court also considered whether proof of coercive enforcement of Principle 3 or of the purported agreement among the defendants was necessary to satisfy the Section 1 agreement criterion. Relying on *Goldfarb v. Virginia State Bar*, 421 U.S. 773 at 791, n. 21, 95 S.Ct. 2004, 2015 n. 21, 44 L.Ed.2d 572 (1975), the Court noted that even without a threat of professional discipline, the mere existence of ethical opinions of professional associations constitutes substantial reason to adhere to the standards because professionals would comply in order to assure that they did not discredit themselves by departing from professional norms. Thus, the *Wilk* Court held:

... even without coercive enforcement, a court may find that members of an association promulgating guidelines sanctioning conduct in violation of Sec. 1 participated in an agreement to engage in an illegal refusal to deal.

719 F.2d at 230.

Next, the Court held that if the plaintiffs met their burden of showing that the effect of Principle 3 and the implementing conduct had been to restrict competition rather than to promote it, the defendants could then come forward to show:

(1) that they genuinely entertained a concern for what they perceive as scientific method in the care of each person with whom they have entered into a doctor-patient relationship; (2) that this concern is objectively reasonable; (3) that this concern has been the dominant motivating factor in defendants' promulgation of Principle 3 and in the conduct intended to

---

1. A full description of the defendants is set forth in *Wilk* and will not be repeated here.

implement it; and (4) that this concern for scientific method in patient care could not have been adequately satisfied in a manner less restrictive of competition. 719 F.2d at 227. This was called the "patient care defense." Finally, with respect to the plaintiffs' Section 2 claim, the Court of Appeals noted that it was not separately argued on appeal, and the Court declined to separately discuss it.

Shortly before the scheduled trial before this court, the plaintiffs waived their claim for damages and sought only injunctive relief. This turned the case from a jury to a bench trial, and it shifted the focus of the case from the past to the present in order to determine whether the plaintiffs were entitled to injunctive relief under Section 16 of the Clayton Act.

## II. *Summary of This Court's Rulings*

In view of the length of this opinion, I shall summarize my principal findings. The AMA and its officials, including Dr. Sammons, instituted a boycott of chiropractors in the mid–1960s by informing AMA members that chiropractors were unscientific practitioners and that it was unethical for a medical physician to associate with chiropractors. The purpose of the boycott was to contain and eliminate the chiropractic profession. This conduct constituted a conspiracy among the AMA and its members and an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

The AMA sought to spread the boycott to other medical societies. Other groups agreed to participate in the boycott by agreeing to induce their members to forego any form of professional, research, or educational association with chiropractors. The defendants which knowingly joined in the conspiracy were ACR (which has now been dismissed from the case) and AAOS. None of the defendants established the patient care defense. The plaintiffs are entitled to injunctive relief against the AMA, but not against AAOS or Dr. Sammons. The actions of the other defendants, JCAH and ACP, were taken independently of the AMA boycott and these defendants did not join the conspiracy. Accordingly, defendants JCAH, ACP, AAOS and Dr. Sammons are dismissed.

The plaintiffs' Section 2 claim was limited to the defendants' alleged conspiracy to monopolize the hospital health care market through restrictive hospital accreditation standards promulgated by JCAH. In view of the court's finding that JCAH did not join the conspiracy, the Section 2 claim is dismissed.

## III. *New Zealand Report*

During trial I reserved ruling on an important evidentiary ruling, the admissibility of a report summarizing the findings of a task force appointed by the New Zealand government to study chiropractic in that nation, "Chiropractic in New Zealand: Report of the Commission of Inquiry" ("the New Zealand Report"). (PX 1829.) The New Zealand Report was heavily relied upon by the plaintiffs to show that chiropractic was a valid health care profession. The defendants opposed introduction of the report, and the parties have now briefed the issue.

■ The Report was published in 1979 after nearly two years of investigation including 78 days of public hearings, 15 days of closed sessions, and visits to medical and chiropractic establishments both in New Zealand and other English-speaking countries. The plaintiffs assert that these acts entitle the Report to admission as evidence both for the truth of the matters asserted and for the purpose of showing the information available on chiropractic as of 1979. With one narrow exception, I disagree.

■ Rule 803(8) of the Federal Rules of Evidence, which is an exception to the hearsay rule embodied in Rule 802, makes admissible:

Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... in civil actions ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

The burden of proving untrustworthiness lies with those opposing admission. As explained in the advisory committee notes, "the rule ... assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present." Among these factors are the untimeliness of the inquiry, the lack of special skill or experience on the part of the investigating officials, procedural defects in the conduct of the investigation (such as failure to hold hearings), and/or the bias or motivation problems of the investigators. Other factors, both positive and negative, may, of course, also be considered.

With these considerations in mind, the defendants assert that the New Zealand Report is fundamentally untrustworthy primarily because its conclusions are based upon otherwise inadmissible, unreliable evidence collected and evaluated by persons with no particular skill or background to make assessments respecting the safety or efficacy of health care practices. Defendants particularly object to the New Zealand Commission's acceptance, at "face value," of the testimonial accounts of patients' experiences with chiropractors. The Commission found that such "evidence is not decisive, but it is compelling."

Defendants' view of the scientifically questionable basis of the New Zealand Report's conclusions is supported by a review of the Report prepared by the United States Congress' Office of Technology Assessment ("the OTA review"). (Exhibit A to Memorandum of Defendant ACR in Opposition to Admission of New Zealand Report.) That review questions the applicability of the New Zealand findings to the United States and finds "serious problems" in the Report's treatment of safety and efficacy issues. Although the plaintiffs have suggested that the OTA review may be biased because it was prepared by a doctor of medicine, the court disregards these conclusory allegations. The OTA review itself is balanced and well-reasoned in its assessment of the New Zealand Report. Its primary criticism of the Report is not that its conclusions are wrong, but that they are not based upon well-designed, controlled clinical trials. Regarding the efficacy of chiropractic, the New Zealand Commission considered only five randomized trials. Of these, only two involved chiropractic services—each of which contained significant design flaws. The OTA review concluded: "There is a strong hint that spinal manipulation has efficacy in the immediate relief of back pain and other kinds of pain that goes beyond placebo effect. However, this can only be considered suggestive without further research." (Id. at 6.) With respect to the question of chiropractic safety, the OTA review—after disparaging as "not evidence" anecdotal accounts in the medical literature purporting to show chiropractic is unsafe—stated it was unable to find any well-designed study. It concluded, consistent with this finding, that the New Zealand Report's review of the safety issue was "unsatisfactory." (Id. at 6.)

In light of this thorough and well-considered appraisal of the New Zealand Report, with which I agree, I do not find the Report's conclusions trustworthy. The request for admission for the purposes of showing the truth of the matter asserted is therefore denied.

■ The plaintiffs urge, alternatively, that the New Zealand Report should be admitted to show first notice to the defendants that chiropractic was not quackery, and second that any belief that chiropractic was quackery could not be objectively reasonable. To the extent that the Report is offered solely to show information available on chiropractic in the latter half of 1979, the request to admit is unobjectionable. It is not, however, especially probative. The Report was not written until three years after the commencement of this lawsuit; its only possible relevance is with respect to plaintiffs' continuing violation point. The Report therefore may come in to show that the defendants may have suspected that their public position on chiropractic was untenable. It may not come in to show that that public stand was objectively unreasonable. To hold otherwise would negate my ruling on admissibility for the truth of the matter asserted. As the defendants correctly note, there is no

basis upon which to infer that the defendants' belief was not reasonable absent reliance on the truth of the Report itself. I hold, accordingly, that the New Zealand Report may be admitted, but only for the limited purpose stated.

### IV. Liability of the Defendants

#### A. American Medical Association ("AMA") and Dr. Sammons

##### 1. Boycott Activities

In the early 1960s the AMA became concerned that medical physicians were cooperating with chiropractors. (PX 550A.) In 1963, the AMA hired as its general counsel the author of the Iowa Medical Society's plan to contain chiropractic in Iowa. (Throckmorton Dep.) As early as September 1963, the AMA's objective was the complete elimination of the chiropractic profession. (PX 173.) In November of 1963, the AMA authorized the formation of the Committee on Quackery under the AMA's Department of Investigation. (PX 555–59.)

In 1964, the Committee's primary goal was to contain and eliminate chiropractic. (PX 464, 727; Stevens Tr. 2104, 2117, 2122, 2162, 2170, 2185.) Throughout the 1960s and early 1970s, H. Doyl Taylor, the chairman of the Department of Investigation, repeatedly described the Committee's prime mission to be the containment and elimination of chiropractic as a recognized health care service. (PX 464, 466, 188.) I found his video deposition denials, and his explanation that at all times he and the Committee only meant to eliminate chiropractic as a health hazard, incredible and unworthy of belief. Mr. Taylor believed that chiropractic was based on a "single cause—single cure" theory of disease and that given this baseless foundation, the entire profession should be swept away.

The Committee worked aggressively to achieve its goals in several areas. It conducted nationwide conferences on chiropractic (PX 565, 742, 1177); prepared and distributed numerous publications critical of chiropractic (e.g., Holman Dep.); assisted others in the preparation and distribution of anti-chiropractic literature (e.g., PX 251, 439); regularly communicated with medical boards and associations, warning that professional association between medical physicians and chiropractors was unethical (e.g., PX 466, 498, 550, 550A, 1288, 12C, 7296, 1705); and attempted to discourage colleges, universities, and faculty members from cooperating with chiropractic schools (e.g., PX 532, 456, 1519, 790; Fineberg Dep.; Tr. 2112–15).[2]

In 1966, the AMA adopted an anti-chiropractic resolution. (PX 464.) This resolution, recommended by the AMA Board of Trustees and adopted by the House of Delegates, called chiropractic an unscientific cult. (PX 464, 500.) This label implicitly invoked Principle 3 of the AMA's Principles which made it unethical for a physician to associate with an unscientific practitioner. (E.g., PX 56, 156A, 499A, 741, 745, 746.) In 1967, the AMA Judicial Council[3] issued an opinion under Principle 3 specifically holding that it was unethical for a physician to associate professionally with chiropractors. (Tr. 2939.) "Associating professionally" would include making referrals of patients to chiropractors, accepting referrals from chiropractors, providing diagnostic, laboratory, or radiology services for chiropractors, teaching chiropractors, or practicing together in any form. This opinion was published in the 1969 Opinions and Reports of the Judicial Council of the AMA ("1969 Opinions," PX 505) which was widely circulated to members of the AMA.

---

**2.** The Committee worked to influence legislation on the state and federal levels and engaged in informational activities to inform the public on the nature of chiropractic. All of this activity is protected under the Noerr–Pennington doctrine and I have not relied on any such conduct in reaching any conclusion in this case. The Wilk Court specifically approved the jury instruction used in the first trial that stated that defendants' advocacy activity directed to legislative and administrative agencies or bodies was protected if the "defendants undertook such efforts to influence governmental bodies with a sincere purpose to obtain the governmental actions that they sought." 719 F.2d at 229.

**3.** The Judicial Council is now known as the Council on Judicial and Ethical Affairs, but I shall refer to it in this opinion by its original name.

(Holman Dep.) The opinion on chiropractic was also sent by the AMA to 56 medical specialty boards and associations. (PX 550, 550A.)

The AMA and the Committee on Quackery used the anti-chiropractic policy statement as a tool—what the Committee called a "necessary tool"—to spread the boycott to other medical groups. The Committee's efforts were successful. (PX 464.) Other groups, including some of the defendants, specifically adopted or approved the policy statement on the ethical prohibition against association with chiropractors. (PX 464, 478B, 1166, 120.) In 1971, the Committee made a report (PX 464) of its activities to the AMA Board of Trustees and described the policy statement as follows:

> This was the necessary tool with which your Committee has been able to widen the base of its chiropractic campaign. With it, other health-related groups were asked and did adopt the AMA policy statement or individually-phrased versions of it. These, in turn led to even wider acceptance of the AMA position.
>
> \* \* \* \* \* \*
>
> The hoped-for effect of this widened base of support was and is to minimize the chiropractic argument that the campaign is simply one of economics, dictated and manipulated by the AMA.

The memorandum further stated:

> The Committee has not submitted such a report [earlier] because it believes that to make public some of its activities would have been and continues to be unwise. Thus this report is intended only for the information of the Board of Trustees.

Principle 3 was widely viewed as proscribing association with chiropractors. The three defendants who issued the Status Report on Chiropractic Lawsuits in 1978 acknowledged in that Report that Principle 3 proscribed association with chiropractors. (PX 1069.) Any reasonable

medical physician who read Principle 3 and either the AMA policy statement or any AMA reference to chiropractors as unscientific practitioners, would conclude that it was unethical for medical physicians to associate with a chiropractor. (E.g., PX 499A, 1477B.)

In 1973, the AMA drafted Standard X, which incorporated the unscientific practitioners ethics bar into the JCAH hospital accrediting standards. (PX 2266, 72.) The AMA urged JCAH to adopt Standard X, and JCAH complied. (*Id.*) Keeping chiropractors out of hospitals was one of the goals of the boycott. (PX 9D, 9E, 9F, 9G, 12B, 12C, 18.) When chiropractic was included under Medicare in 1973, the AMA became concerned that this would open the way for chiropractors to be on hospital staffs. (E.g., PX 651, 700.) Doyl Taylor caused the Office of General Counsel of the AMA to publish an article entitled "The Right and Duty of Hospitals to Exclude Chiropractors" in the Journal of the American Medical Association. (PX 464.) This was intended to offer advice to hospital trustees across the country. (PX 716.) It also told every hospital attorney that JCAH accreditation might be lost if hospitals dealt with chiropractors. (E.g., PX 12B, 12C.) [4]

The Committee on Quackery disbanded in December of 1974. By this time, chiropractic had achieved licensing in all fifty states, chiropractic services had become reimbursable through Medicare, Medicaid, and virtually every private health insurance plan, and the chiropractic educational system had been given official sanction by the United States Office of Education. Nevertheless, the Committee pronounced itself a success. (Taylor Vid. Dep; PX 464.) The AMA believed that chiropractic would have achieved greater growth if it had not been for the Committee's activities.

---

**4.** The JCAH accreditation standards prior to 1983 did not permit a hospital to allow chiropractors on the medical staff or to obtain hospital privileges, except to the extent allowed by state law. (E.g., PX 6, 828A, 10A, 11A, 14A, 12C.) The legality of JCAH's actions prior to the 1983 revisions to the JCAH standards, and

the responsibility of the member owners for such actions, will be discussed fully in the section of this opinion dealing with JCAH. I do not find that the AMA, or any other member of JCAH, is legally responsible for the pre–1983 accreditation standards.

(PX 253.) In May of 1975 the AMA Department of Investigation was disbanded and Doyl Taylor left the employ of the AMA. (PX 7292; Taylor Vid. Dep.)

This lawsuit was filed in 1976. In that year, the Judicial Council suspended distribution of the 1971 Opinions which contained the anti-chiropractic policy. (Tr. 2939.) Later that year the AMA Judicial Council adopted Opinion 3.50 and in March of 1977 Opinions 3.60, 3.70, and 3.71 were adopted. (Tr. 2940; DX 21231.) Under these opinions, a medical physician could refer a patient to a "limited licensed practitioner" for diagnostic or other health care services. Although there was no express reference to chiropractors, chiropractors would fall within the definition of "limited licensed practitioners." Next, a medical physician could choose to accept or decline patients sent to her or him by a licensed practitioner or by a layman. Finally, a medical physician could engage in any teaching permitted by law for which she or he is qualified. However, the relaxation of the right to refer patients was not without qualification. Opinion 3.60 specifically required that a medical physician should not refer a patient unless she or he is confident that the services provided on referral will be performed in accordance with accepted scientific standards. In addition, Opinion 3.01 provided that it is "wrong to engage in or aid and abet any treatment which has no scientific basis and is dangerous." Distribution of the revised opinions began in May of 1977. (Tr. 2941.) Principle 3 was still in effect.

In July of 1979, the AMA House of Delegates adopted Report UU. Report UU (Tr. 2941; PX 7248) was the AMA's new policy statement on chiropractic. It was a very begrudging change of position. Although it is now hailed by the AMA lawyers and Dr. Alan R. Nelson (Tr. 2028–33), present Chairman of AMA's Board of Trustees, as a recognition by the AMA of the growth and development of chiropractic as a valid health care service, the Report does not convey that change of heart. First, Report UU states that the AMA knows of no scientific evidence to support spinal manipulation and adjustment as appropriate treatment for such diseases as cancer, diabetes, and infections. It does not declare support for that which the AMA seemingly now approves—chiropractic manipulation for musculoskeletal problems. Next the Report condemns the single cause of disease theory and states that "chiropractors disagree on the extent to which they accept or reject traditional chiropractic doctrine." The Report does not state that the two major chiropractic associations had rejected the doctrine in 1969. (PX 245.) But the Report continues:

> Describing chiropractic as an "unscientific cult" does not, however, necessarily mean that everything a chiropractor may do when acting within the scope of his or her license granted by the state is without therapeutic value, nor does it mean that all chiropractors should be equated with cultists. It is better to call attention to the limitations of chiropractic in the treatment of particular ailments than to label chiropractic an "unscientific cult."

The Report then reaffirms that a physician should at all times practice a method of healing founded on a scientific basis. This again directly tied into Principle 3 which prohibited association with unscientific practitioners. Although the Report ends by stating that a medical physician may refer a patient to a limited licensed practitioner permitted by law to furnish such services, there is no particular reference to chiropractors. Report UU was obviously written by lawyers in an effort to bring the AMA into compliance with the antitrust laws, and not a bold change of position designed to reverse the attitudes of the AMA members formed, at least in part, by the then eleven-year old boycott.

In December of 1978, the AMA House of Delegates adopted Resolution 14 which provided that medical physicians "continue to exercise the duty to expose unscientific practices and practitioners while supporting and protecting the freedom of individuals to choose among physicians, other licensed practitioners or religious healers as part of the American tradition." (PX 7248.) It is hard to tell the purpose of this

resolution, other than to suggest a similarity between chiropractors and Elmer Gantry, but it once again keyed into Principle 3 which condemned association with unscientific practitioners.

In 1980 the AMA adopted a completely revised version of the principles of medical ethics. (Tr. 2947–48; DX 21233.) Principle 3 finally was eliminated. The new principles provided that a medical physician "shall be free to choose whom to serve, with whom to associate, and the environment in which to provide medical services." (PX 7249.) The revised principles theoretically do allow association with chiropractors but there is no explicit reference to chiropractors in the new code.

The revised code received a fair amount of publicity in the medical and private press in 1980. (DX 21209, 21211–12, 21221.) The revision was interpreted as changing the AMA's position on chiropractic in response to various pressures, including the legal climate. And yet, two years later, when Dr. Daniel T. Cloud, who was then finishing his term as president of the AMA, was asked in a formal interview whether the 1980 ethics code changed the position of doctors with regard to chiropractors— "Was there a change?—he stated, "No." (PX 7125.) This fairly bizarre answer (considering the nature of the publicity the ethics revision received) today is explained by the AMA's lawyers as a technically accurate answer since, they assert, the change in position was accomplished in 1977 and 1979. Yet today the AMA relies on the revision of the ethical standards in 1980 as part of its change in position on chiropractic. The lawyers' argument is not persuasive. In 1982 the president of the AMA appears to be announcing that the AMA has not changed its position on chiropractic.

The AMA settled three chiropractic lawsuits in 1978, 1980 and 1986 by stipulating and agreeing that under its current opinions of the Judicial Council a medical physician may, without fear of discipline or sanction by the AMA, refer a patient to a duly licensed chiropractor when he believes that referral may benefit the patient. The AMA confirmed that a physician may teach at a chiropractic college or seminar and that a physician may choose to accept or decline patients sent to him by a chiropractor. The only settlement entered into prior to the end of the boycott was in 1978, and that settlement did not effectuate a termination of the boycott since Principle 3 was still in effect.

In 1983 the AMA participated in the revision of the JCAH accreditation standards for hospitals. The revision process started in 1982 with recommendations from the JCAH staff and the JCAH Standard–Survey Procedures Committee that each hospital, through its governing body, be permitted to decide for itself, under applicable state law, which licensed health care providers would be allowed hospital privileges and membership on the medical staff. (Tr. 1775.) The AMA initially supported this approach but it was severely criticized by its members and other medical societies which wanted to ensure medical and osteopathic physician control of the medical staff and patient care in hospitals. (E.g., PX 7101–02, 7146, 7161–68, 7192, 7317.) As a result of this criticism, the AMA changed its position and supported revisions which would ensure such control. (PX 7102, 7109.) In February of 1983, the AMA voted to recommend revised standards that would require the medical staff of each hospital to have an "executive committee," the majority of which had to be medical or osteopathic physicians. (PX 7102.) The executive committee would make recommendations to the hospital's governing body for its approval of credentialing, membership on the medical staff, hospital privileges delineations, and structure of the medical staff. Any dispute between the medical staff and the governing body of the hospital would have to be resolved jointly by them. (PX 7142–48, 7150–54.) In late 1983, JCAH adopted the new standards which included the mandatory, medical physician dominated executive committee concept. (Tr. 1771–74.)

The plaintiffs rely heavily on the 1983 accreditation standards to show that the conspiracy was ongoing. This issue is discussed generally in the section of this opin-

ion dealing with JCAH, and, in short, I have rejected the argument. What is noteworthy with respect to the AMA, however, is that although it believed that the standards originally proposed by the JCAH Standards–Survey Procedures Committee were more in tune with the existing antitrust "legal climate," it was unable to sustain its position when faced with substantial criticism of its members and other medical groups. (PX 7153, 7103, 7120, 7133, 7159, 7192.)

Through the date of the trial, the AMA continued to respond to requests for information on chiropractic which it received from AMA members and others by sending out anti-chiropractic literature. (PX 7230, 7245–47, 7219–20, 7224–25, 7287, 7210, 7227, 7234–36, 7238–39.) The old boycott language has been eliminated, but the AMA has not had anything positive to say about chiropractic. It was not until midway through the trial of this case that the AMA announced that chiropractic has improved and that at least some forms of chiropractic treatment and joint adjustments are scientific. (Tr. 1214–17, 1222, 1249–56, 1259–60, 1975–76, 2029–30, 2984.) The membership has never been informed of this position.

■ The plaintiffs argue that the AMA boycott began in 1966 and continued until 1983 when the JCAH accreditation standards were revised. The AMA argues that Report UU and the 1977 opinions constituted a change in the AMA's policy on chiropractors and that any conspiracy ended in 1977 or before. I reject both positions. The discussion of the 1983 revision of the JCAH standards is continued in the section of this opinion dealing with JCAH. Regarding the AHA's argument, Report UU and the 1977 opinions were clearly inadequate to end the boycott, and probably deliberately so. This is well demonstrated by the American College of Physicians' analysis of the 1977 revisions of the opin-

ions. (PX 1440.) In a 1978 report to its members, the ACP stated:

> In 1977, as noted above, a revision of the Judicial Council interpretations of the AMA Principles of Medical Ethics appeared. The explicit language of 1966 was absent; there was no reference to *chiropractic* per se. In many places, the language used was unclear and ambiguous.
>
> Paragraph 1, Section 3.50, of the 1977 Judicial Council Opinions and Reports does, however, remain forthright:
>
> "A physician should not use unscientific methods of treatment, nor should he voluntarily associate professionally with anyone who does. It is wrong to engage in, or to aid and abet in treatment which has no scientific basis and is dangerous, is calculated to deceive the patient by giving him false hope, or which may cause the patient to delay in seeking proper care until his condition becomes irreversible."

This interpretation supports the court's view that the 1977 opinions were ambiguous and that the use of the key phrase "unscientific methods" continued to signal the existence of the boycott. I also find that the settlement agreements in other chiropractic litigation that occurred prior to 1980 did not end the boycott since Principle 3 was still in effect and the AMA had never publicly stated that its policy on chiropractic (calling chiropractic "unscientific") was wrong. I conclude that the AMA and its members engaged in a group boycott or conspiracy against chiropractors from 1966 to 1980, when Principle 3 was finally eliminated.[5]

### 2. *Unreasonable Restraint of Trade*

The next question is whether the boycott or conspiracy constituted an unreasonable restraint of trade under Section 1 of the Sherman Act. To answer this question, I have undertaken a rule of reason analysis.

---

5. Dr. Sammons was a willing participant in the conspiracy. As an AMA trustee, Dr. Sammons was on the Committee on Quackery Oversight Panel of the Board of Trustees of the AMA and recommended continued funding of the Committee with knowledge that its prime mission was to be to contain and eliminate chiropractic. (PX 1391.) Dr. Sammons presently is the Executive Vice President of the AMA.

■■■■ The relevant market was the provision of health care services to the American public on a nationwide basis, particularly for the treatment of musculoskeletal problems. As noted by the Court of Appeals, some medical physicians (such as orthopedic surgeons, internists, and general practitioners) are in direct competition with chiropractors in this market. Medical physicians and chiropractors are interchangeable for the same purposes. (Tr. 423–26, 429–30, 433–34, 1259, 1953, 2108, 7140, 1449.) Consumers seek both medical physicians and chiropractors for the same complaints, principally back pain and other neuromusculoskeletal problems, and both groups render services for the treatment of those complaints. (Tr. 1104–36; PX 7247, 1055, 1529 at 46, 7208.) Competition between medical physicians and chiropractors was recognized by Dr. Joseph A. Sabatier, a member of the Committee on Quackery and a former defendant in this case, as early as 1964. At one point, Dr. Sabatier stated, "it would be well to get across that the doctor of chiropractic is stealing [the young medical physician's] money." (PX 322; see also, PX 172 at 8, 241.)

The AMA's intent is clearly relevant to the rule of reason analysis. The boycott was intended to contain and eliminate the entire profession of chiropractic. (Taylor Vid. Dep.; PX 464; Tr. 2104, 2117, 2122, 2162, 2170, 2185.) Whether or not the elimination of competition per se was consciously intended, that was the natural result of an intent to destroy a competitor. The AMA's market power is also relevant. Members of the AMA constitute a substantial force in the provision of health care services in the United States. (Tr. 416.) They constitute a majority of medical physicians (PX 7325, 7327–28; Tr. 415–16), and a much greater portion of fees paid to medical physicians in the United States is paid to AMA members. (Tr. 416.)

Given the substantial market power of AMA members and the specific intent of the AMA, a substantial adverse effect on competition is evident.[6] Despite the fact that the number of chiropractic schools, the number of chiropractors, and the number of chiropractic schools, the number of chiropractors, and the number of patient visits to chiropractors grew during the boycott, I accept the Committee on Quackery's admissions that the boycott was successful. (Taylor Vid.Dep.; PX 464.) These admissions were not mere puffery. The success of the boycott is shown in part by the adverse reaction of various medical societies to the AMA's modification of its anti-chiropractic policy in 1977 and the AMA's settlement of some chiropractic lawsuits in the late '70s and early '80s. (E.g., PX 1069.) Many medical physicians individually criticized the AMA for ameliorating its policy. This shows substantial support for the boycott. (Id.) It was also clear to me from the testimony, particularly of the older medical physicians, that medical physicians acted in conformity with Principle 3. (E.g., PX 1498A, 1467, 1477B, 1519A, 14A; Stronach Dep.; Bender Dep.) A principle of medical ethics is inherently a forceful mandater of conduct. No honest professional wants to risk the stigma of being labeled unethical. As the Court of Appeals noted, the fact that the AMA never sanctioned or disciplined a member for violation of Principle 3 is not controlling. Enforcement was not necessary to obtain compliance with the boycott.

The anti-competitive effects of the boycott were generally conceded by the defendants' expert, William J. Lynk of Lexecon Inc. (Tr. 1290–1346, 1361–1555.) Some of the anti-competitive effects acknowledged by Mr. Lynk include the following: it is anti-competitive and it raises costs to interfere with the consumer's free choice to take the product of his liking; it is anti-competitive to prevent medical physicians from referring patients to a chiropractor; (Lynk 1427–28) it is anti-competitive to impose higher costs on chiropractors by forcing them to pay for their own x-ray equip-

6. The matter is so clear that in 1979 an AMA lawyer agreed that a medical organization that engages in activities calculated to professionally ostracize any member who voluntarily engages in any kind of a professional relationship with a chiropractor is in restraint of trade, and a general boycott against all doctors of chiropractic is indefensible. (PX 7184.)

ment rather than obtaining x-rays from hospital radiology departments or radiologists in private practice; and it is anti-competitive to prevent chiropractors from improving their education in a professional setting by preventing medical physicians from teaching or lecturing to chiropractors. (Tr. 1409–22, 1424–31.) Mr. Lynk agreed that in an economic sense a boycott such as the one described by plaintiffs raises the costs of chiropractic services and creates inefficiencies and economic dislocations. Obviously, Mr. Lynk did not concede the existence of the boycott but agreed that these would be anti-competitive effects that would flow from such a boycott. I have also considered the fact that, as conceded by Mr. Lynk, there are substantial barriers to the entry of new chiropractors into the field, such as substantial education requirements. These barriers increase the likelihood that the boycott had a substantial adverse effect on competition.

The Court of Appeals in *Wilk*, which reviewed substantially the same boycott evidence, concluded:

> Through such mechanisms, individual physicians were discouraged from cooperating with chiropractors in: patient treatment, because referrals were inhibited by defendants' activities; research; and educational activities, such as sharing clinical experience and research results. Chiropractors were denied access to the hospital facilities they considered necessary to practice their professions. Medical doctors were discouraged from aiding chiropractors in interpreting electrocardiograms. Requests by individual plaintiffs to use laboratory and X-ray facilities were not granted; requests for hospital in-patient privileges were similarly denied. Referrals from medical doctors were reduced. Public demand for chiropractic services was negatively affected.

719 F.2d at 214.

The defendants argue that all of this evidence is not enough—that the plaintiffs must specifically prove an impact on price and output. The cases do not support that position. As Professor Areeda recent-

ly noted in his article "The Rule of Reason—a Catechism on Competition," 55 *Antitrust Law Journal*, 571 (1986), the Supreme Court has held that the purpose of the inquiry into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition. If there is actual proof of adverse effects, then the plaintiffs need not prove market definition and market power. The Supreme Court in *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 2019, 90 L.Ed.2d 445 (1986), stated that "the inquiry into market power is but a surrogate for detrimental effects."

The AMA relies on Mr. Lynk's conclusion that the boycott had pro-competitive effects that would have outweighed the anti-competitive effects. (Tr. 1409.) Mr. Lynk's theory is that the boycott constituted non-verbal communication which informed consumers about the differences between medical physicians and chiropractors, and that this had a pro-competitive effect. (Tr. 1411–12.) I reject this opinion as speculative. (Tr. 1434–43.) Mr. Lynk neither conducted nor read any studies regarding the efficacy of such nonverbal communications. *Id.* He neither conducted nor read any surveys of consumer opinion to determine whether consumers were confused about the differences between medical physicians and chiropractors. (*Id.*) I saw no evidence of any such confusion during the trial. Mr. Lynk's opinion does not accord with common sense. A nationwide conspiracy intended by its participants to contain and eliminate a licensed profession cannot be justified on the basis of Mr. Lynk's personal opinion that it was pro-competitive, nonverbal communication to consumers.

### 3. *Antitrust Injury*

Having determined that the effect of Principle 3 and the implementing conduct has been to unreasonably restrict competition rather than to promote it, I now consider whether the plaintiffs have shown injury of the kind the antitrust laws were designed to prevent.

The plaintiffs principally rely on the testimony of Dr. Miron Stano, their economic expert. Dr. Stano compared the income of chiropractors, podiatrists, and optometrists over the relevant period of time and concluded that the income of chiropractors was lower than that of the other, comparable limited licensed practitioners. (Tr. 458.) He viewed this as consistent with the boycott theory. He also noted a jump in chiropractors' income during the period 1978 to 1980 and he concluded that the jump was consistent with the acknowledged lessening of the boycott by the AMA during that period. (Tr. 461.)

The defendants' economic expert, Mr. Lynk, faulted the data relied upon by Dr. Stano (Tr. 1309–20), but he agreed that if he were to compare chiropractors' income to comparable groups, he would also include podiatrists and optometrists, as well as other groups, but he would seek further explanations for the differences between the groups' incomes. (Tr. 1464–67.) Mr. Lynk further criticized the "jump" analysis done by Dr. Stano due to the fact that Dr. Stano relied on income projections from the Bureau of Labor Statistics ("BLS"). (Tr. 1310, 1322–23, 1500.) Defendants argued that BLS statistics are a poor source to begin with, and that reliance on such statistics further was not justified because in 1980 BLS began to note that it obtained its income projections for chiropractors from the American Chiropractors Association, thus signaling a change in the data collection methodology used by the BLS. This revelation caused the recalling of Dr. Stano, the introduction of a new defense expert, Mr. Robert Topel, a labor economist from the University of Chicago, and a new deposition of Dr. Stano. Mr. Topel's testimony cast further doubt on the BLS data used by Dr. Stano. (Topel Tr. 3574–3589.) However, the cross examination of Mr. Lynk demonstrated to my satisfaction that the data used by Dr. Stano were reasonable. Several of the critical numbers had some independent verification. (Tr. 1525–30.) I have also considered Mr. Topel's criticism but find that the data collection procedures used by the BLS during the relevant time remained consistent enough to be useful in this case.

I do not rely on Dr. Stano's evidence in isolation. I understand that the data are not the best that could be used for such studies, but the best data, suggested by Mr. Topel, do not exist. What lends support to Dr. Stano's result is the very strong evidence of a pervasive, nationwide, effective conspiracy which by its very nature would have affected the demand curve for chiropractic services and adversely affected income of chiropractors. Again, defendants' economist, Mr. Lynk, agreed that such a conspiracy would shift the demand curve for chiropractic services. (Tr. 1415–22.)

The plaintiffs also established injury to reputation suffered by chiropractors. Both economic experts believed that injury to reputation would constitute an anti-competitive effect of the boycott. (Tr. 410–11, 1456–59.) *See Weiss v. York Hospital,* 745 F.2d 786, 806–07 (3rd Cir.1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985) (policy denying staff privileges to osteopaths likely to injure their professional reputations). In addition to labeling all chiropractors as unscientific cultists and depriving chiropractors of association with medical physicians, injury to reputation was assured by the AMA's name-calling practice. For example, in 1973, Dr. Sabatier, an AMA official, described chiropractors as rabid dogs and killers. (PX 1288.) Such statements were made in furtherance of the conspiracy and obviously injure reputations.

### 4. *Rejection of Per Se Violation*

The Seventh Circuit has already held that Principle 3 escapes per se treatment because it involves a medical ethic which nonfrivolously addresses the importance of scientific method, a subject well within the natural ambit of a medical association. The plaintiffs argue that the Supreme Court's decision in *F.T.C. v. Indiana Federation of Dentists,* 106 S.Ct. 2009 (1986), decided after *Wilk,* compels application of the per se analysis. I disagree. First, *Indiana Dentists* itself was decided

under a rule of reason analysis. Although the Supreme Court rejected the dentists' rationale that the withholding of x-rays in that case was justifiable as being in the best interests of patients, and specifically said that such a purported justification was legally and factually marred, the Court did not apply a per se rule.

*Indiana Dentists* is quite like *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). In both cases the Supreme Court refused to allow professional competitors to deprive consumers of information they desired, and in both cases the court rejected the professionals' purported consumer welfare justifications for the restraint. I believe the result in *Indiana Dentists* was based on the same rationale that decided *Professional Engineers*. I do not read *Indiana Dentists* as requiring a per se analysis. The plaintiffs also urge that *Indiana Dentists* eliminates the patient care defense created by the Seventh Circuit in *Wilk*. The Supreme Court did not address the specific issue of whether patient care defense on the facts in this case would be allowed, and since *Indiana Dentists* is much more like *Professional Engineers* than this case, I believe I must follow *Wilk*.

5. *Patient Care Defense*

I now consider whether the AMA has established the *Wilk* patient care defense. The first element is whether the AMA and its members genuinely entertained a concern for scientific method in the care of patients. I have some questions about the genuineness of the AMA's concern for scientific method based on the fact that when the AMA adopted changes in its chiropractic policy between 1977 and 1980, it apparently did so without deciding whether chiropractic was scientific. That shows disregard for scientific method in patient care. Nevertheless, I conclude that the AMA has established this element. At the time it was attacking chiropractic as unscientific, it was attacking other unscientific methods of treatment of disease, for example the Krebiozen treatment of cancer. The existence of medical standards or

guidelines against unscientific practice is common. Other medical societies have long had such prohibitions and the chiropractors themselves have a similar ethical guideline. (DX L31.) So I conclude that the AMA has established the first element of genuine concern.

The next element is whether the concern for scientific method in patient care is objectively reasonable. In connection with this element of the patient care defense, the parties have devoted a substantial amount of effort in attempting to prove that chiropractic was either good or bad, efficacious or deleterious, quackery or science. At the time the Committee on Quackery was operating, there was a lot of material available to the Committee that supported its belief that all chiropractic was unscientific and deleterious. (Tr. 2063–90.) In fact, there was a substantial amount of evidence on which the Committee reasonably could conclude that chiropractic was based on the single cause of disease theory, despite some contrary evidence that the theory had been disavowed by modern practitioners. (*Id.*)

There also was some evidence before the Committee that chiropractic was effective—more effective than the medical profession in treating certain kinds of problems such as workmen's back injuries. (E.g., PX 241, 1476, 1471–72, 184, 192–94; Ballantine Dep. 137–39.) The Committee on Quackery was also aware that some medical physicians believed chiropractic to be effective and that chiropractors were better trained to deal with musculoskeletal problems than most medical physicians. (*Id.*; Tr. 2159–74.) The Committee did not follow up on any of these studies or opinions. (*Id.*) Basically the Committee members were doctors who, because of their firm belief that chiropractic had to be stopped and eliminated, volunteered for service on the committee. Dr. David B. Stevens, who testified during the trial, was one of these dedicated individuals who devoted a substantial amount of time to his committee work. (Tr. 2065.) But it was very clear that he and other committee members did not have minds open to pro-

chiropractic arguments or evidence. (Tr. 2159–74.)

The AMA acknowledges that, after the Committee on Quackery disbanded, chiropractic improved (and the AMA takes partial credit for it). For example, Mr. Carlson, one of the AMA's trial attorneys, stated in final argument:

> Dr. Winterstein testified that chiropractic has changed. And it has changed.
>
> And we suggest that one reason that it changed was because of the criticism of its bizarre methods. Now, do you hear in this courtroom anything about one cause/one cure? Sure don't.
>
> You hear about neuromusculo reasons, neuromusculo diagnosis, neuromusculo conditions. This is the new parlance. They have done away, for the most part, with the one cause/one cure. I understand there is one small element of chiropractic that still adheres to it. But it's not the major element.
>
> ... And they have improved.... Chiropractic, I think is still changing. It began really changing when the accrediting arm of the ACA [American Chiropractic Association], as opposed to the ICA [International Chiropractic Association], was accepted, was recognized by the Department of Education as the sole accrediting body for chiropractic.
>
> And that occurred in '73, '74, '75, something like that. And that's really when chiropractic began to evolve.

(Tr. 3132–33.)

Most significantly, Dr. Alan R. Nelson, the current Chairman of the Board of Trustees of the AMA testified (at pp. 2029–30):

> My personal position, and I think that I can accurately reflect the position of the AMA in this, is that the fundamental

theory of chiropractic as it was earlier portrayed was not supported by scientific evidence, first.

Secondly, that the nature of services that are being delivered by chiropractors are now diverse and includes some forms of manipulation that do have a scientific basis.

And, third, the responsibility for determining what is in the best interest of an individual patient rests with the individual practitioner and that there is nothing unethical about me asking a chiropractor to deliver a form of manipulative therapy that appears to me to have a scientific basis, and I think I'm accurately reflecting the testimony of Dr. Epps.[7]

Most defense witnesses agreed that some chiropractic treatment is therapeutic—although certainly no one involved in this case, including the plaintiffs, believes that chiropractic treatment should be used for the treatment of diseases such as cancer, diabetes, heart disease, high blood pressure, and infections. (E.g., Tr. 1214–17, 1222, 1249–56, 1259–60, 1975–76, 2029–30, 2984.) It is hard to pinpoint when the changes in chiropractic testified to by AMA witnesses occurred, but it is likely that they occurred while the boycott was still in effect. Thus the AMA's own evidence suggests that at some point during the boycott there was no longer an objectively reasonable concern that would support a boycott of the entire chiropractic profession.

The plaintiffs clearly want more from the court. They want a judicial pronouncement that chiropractic is a valid, efficacious, even scientific health care service.[8] I believe that the answer to that question can only be provided by a well designed, controlled, scientific study such as the one

---

7. Dr. Charles Harry Epps, an orthopedic surgeon, testified that some musculo-skeletal treatments by chiropractors are scientific and he appeared to include chiropractic manipulation among those treatments. (Tr. 1975–76.) Dr. Epps is presently a member of the Judicial Council of the AMA and he testified for the AMA. (Tr. 1932.)

8. At the beginning of the trial the Court told the parties that the question of whether or not chi-

ropractic is scientific was not an issue in this case and would not be decided by the Court. A courtroom is not the proper forum for such a debate. Plaintiffs have submitted literally dozens of technical papers or reports (PX 7005–78) to demonstrate that there is a developing body of literature involving chiropractic and manipulative therapy (most of it dated since 1980) but I have not considered the contents of those papers for purposes of this opinion.

urged by the United States Congress' Office of Technology Assessment in its review of the New Zealand Report. In 1980, the AMA House of Delegates urged that such a study be done. No such study has ever been done. In the absence of such a study, the court is left to decide the issue on the basis of largely anecdotal evidence. I decline to pronounce chiropractic valid or invalid on anecdotal evidence.

The plaintiffs, however, point out that the anecdotal evidence in the record favors chiropractors. The patients who testified were helped by chiropractors and not by medical physicians. (Tr. 1109–36.) Dr. Per Freitag, a medical physician who associates with chiropractors, has observed that patients in one hospital who receive chiropractic treatment are released sooner than patients in another hospital in which he is on staff which does not allow chiropractors. (Tr. 812.) Dr. John McMillan Mennell, M.D. testified in favor of chiropractic. (Tr. 35–42.) Even the defendants' economic witness, Mr. Lynk, assumed that chiropractors outperformed medical physicians in the treatment of certain conditions and he believed that was a reasonable assumption. (Tr. 1414.)

The defendants have offered some evidence as to the unscientific nature of chiropractic. The study of how the five original named plaintiffs diagnosed and actually treated patients with common symptoms was particularly impressive. (Tr. 2208–319.) This study demonstrated that the plaintiffs do not use common methods in treating common symptoms and that the treatment of patients appears to be undertaken on an ad hoc rather than on a scientific basis. And there was evidence of the use of cranial adjustments to cure cerebral palsy and other equally alarming practices by some chiropractors. (Tr. 917.)

I do not minimize the negative evidence. But most of the defense witnesses, surprisingly, appeared to be testifying for the plaintiffs. Taking into account all of the evidence, I conclude only that the AMA has failed to meet its burden on the issue of whether its concern for the scientific method in support of the boycott of the entire chiropractic profession was objectively reasonable throughout the entire period of the boycott. This finding is not and should not be construed as a judicial endorsement of chiropractic.

The next element of the patient care defense is whether the AMA's concern about scientific method has been the dominant motivating factor in the defendants' promulgation of Principle 3 in the conduct undertaken and intended to implement Principle 3. The AMA has carried its burden on this issue. While there is some evidence that the Committee on Quackery and the AMA were motivated by economic concerns—there are too many references in the record to chiropractors as competitors to ignore—I am persuaded that the dominant factor was patient care and the AMA's subjective belief that chiropractic was not in the best interests of patients.

The final question is whether this concern for scientific method in patient care could have been adequately satisfied in a manner less restrictive of competition. It would be a difficult task to persuade a court that a boycott and conspiracy designed to contain and eliminate a profession that was licensed in all fifty states at the time the Committee on Quackery disbanded was the only way to satisfy the AMA's concern for the use of scientific method in patient care. The AMA presented no evidence that a public education approach or any other less restrictive approach was beyond the ability or resources of the AMA or had been tried and failed. The AMA obviously was not successful in defeating the licensing of chiropractic on a state by state basis, but that failure does not mean that they had to resort to the highly restrictive means of the boycott. The AMA and other medical societies have managed to change America's health-related conduct by what appears to be good public relations work and there has been no proof that a similar campaign would not have been at least as effective as the boycott in educating consumers about chiropractic and the AMA's concern for scientific method.

Based on these findings, I conclude that the AMA has failed to carry its burden of persuasion on the patient care defense.

### 6. *Entitlement to an Injunction*

■ Section 16 of the Clayton Act gives private parties the right to seek injunctive relief for violation of the antitrust laws:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings....

In accordance with well established Supreme Court decisions, all that is required to state a case for such relief is "a real threat of future violation or a contemporary violation of a nature likely to continue or recur." *United States v. Oregon State Medical Soc.*, 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969). Thus, although the statutory provision "invokes traditional principles of equity," *Zenith Radio* at 130, 89 S.Ct. at 1580, an antitrust plaintiff need not meet all of the requirements for an injunction imposed by traditional equity jurisprudence. *Commodity Futures Trading Comm. v. Hunt*, 591 F.2d 1211, 1220 (7th Cir.1979).

■ Any relief fashioned by the court must be in accordance with the regulatory scheme and adequately serve the particularized needs of the case before the court. The trial court's discretion must be exercised to effectuate the manifest objective of the specific legislation involved. *Commodity Futures*, 591 F.2d at 1220, quoting *SEC v. Advance Capital Growth Corp.*, 470 F.2d 40, 53 (7th Cir.1972). In view of the strong public policies private antitrust plaintiffs tend to promote, the teaching of *Commodity Futures* is important to the court's decision in this case.

In determining the appropriateness of injunctive relief, courts have typically scrutinized the prior conduct of the defendant. Voluntary cessation of allegedly illegal conduct is looked upon with extreme skepticism by courts but may be a factor in determining the appropriateness of injunctive relief "if the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated. The burden is a heavy one." *United States v. Realty Multi–List, Inc.*, 629 F.2d 1351, 1388 (5th Cir.1980), quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

■ Where a violation has been founded on systematic wrongdoing, rather than on isolated occurrence or event, the Seventh Circuit has observed that a court should be more inclined to issue an injunction. *Commodity Futures*, 591 F.2d at 1220. Relief is appropriate against a defendant which retains a financial interest in continuing antitrust violations and/or a position in the market which could enable it to carry out such anticompetitive activity. *Commodity Futures* indicates that the defendant's acceptance of blame for its conduct is a factor tending to diminish the necessity of injunctive relief. Conversely, lack of contrition would also have some relevance.

■ The plaintiffs urge that a court, once it has found a violation of the antitrust laws, has "the duty to compel action by the conspirators that will, so far as practicable, cure the ill effects of the illegal conduct, and assure the public freedom from its continuance." *United States v. United States Gypsum Co.*, 340 U.S. 76, 88, 71 S.Ct. 160, 169, 95 L.Ed. 89 (1950). While this is the only case I have found which states that such an injunction is *mandatory*, there is no question that a court may consider lingering efforts as a factor. As the Supreme Court stated in *International Salt Co. v. United States*, 332 U.S. 392, 400–01, 68 S.Ct. 12, 17–18, 92 L.Ed. 20 (1947):

The District Court is not obliged to assume, contrary to common experience, that a violator of the antitrust laws will

relinquish the fruits of his violation more completely than the court requires him to do. And advantages already in hand may be held by methods more subtle and informed, and more difficult to prove, than those which, in the first place, win a market.... In an equity suit, the end to be served is not punishment of past transgression, nor is it merely to end specific illegal practices. A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints.

The point, clearly, is to deny those in violation of the Act future benefits from their forbidden conduct. *United States Gypsum Co.*, 340 U.S. at 89, 71 S.Ct. at 169. See also *Oregon State Medical Soc.*, 343 U.S. at 333, 72 S.Ct. at 695. Continuing effects of past illegal conduct, therefore, is an important factor to consider.

■ Because this suit is brought by private citizens, the AMA contends that (1) the plaintiffs must show a threat of personal injury and (2) that they are entitled only to preventive relief disabling that threat. It bases its position on the Supreme Court's recognition that a private litigant's objectives in pursuing an antitrust action are not necessarily congruent with the public interest. *United States v. Borden Co.*, 347 U.S. 514, 518–19, 74 S.Ct. 703, 706–07, 98 L.Ed. 903 (1954). This difference in interests, it adds, renders inapplicable many of the cases cited by the plaintiffs in support of broad injunctive relief. That contention is only partially correct.

It is true that an antitrust plaintiff must prove some kind of personal injury or threat of injury stemming from the defendant's anti-competitive activity in order to maintain its lawsuit; both the Clayton Act and Article III of the Constitution require this much. See *Borden*, 347 U.S. at 518–19, 74 S.Ct. at 706–07 (Clayton Act); Julian O. von Kalinski, 1 *Antitrust Law and Trade Regulation* Section 4.06[6] (1986); *Valley Forge Christian College v. Ameri-*

*cans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) ("at an irreducible minimum, Art. III requires the party who invokes the court's authority to show that he personally has suffered from actual or threatened injury as a result of the putatively illegal conduct of the defendant").

Where the AMA's argument is flawed is in its suggestion that the relief granted to a private plaintiff is *necessarily* more limited than that available were the government bringing the lawsuit. While it is true that a private plaintiff may not bring an action *on behalf* of the public, it does not follow that the relief granted to a private litigant may not take on a "public" character. See *International Salt*, 332 U.S. at 401, 68 S.Ct. at 17 ("A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints"). *See also Hawaii v. Standard Oil Company of California*, 405 U.S. 251, 262, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972) (Congress sought enforcement of antitrust laws by encouraging plaintiffs to serve as private attorneys general). I generally agree, however, that courts should be "quite reluctant to grant 'drastic' or sweeping" injunctive relief to private plaintiffs. von Kalinski, *Antitrust Laws* at Section 4.406[6].

The defendants argue that the plaintiffs have not shown any personal injury, as opposed to just a generalized injury to the profession of chiropractic. This argument has led to an extensive inquiry into each incident by which the plaintiffs claim they were harmed or are being threatened with harm as a result of the boycott. Each rejection suffered by one of the plaintiffs has been dissected to determine whether the boycott was the source of the rejection.[9]

■ It obviously would be extremely difficult to discover facts which would show whether a particular rejection or lost

---

**9.** The material facts relating to the rejections testified to by the plaintiffs (and recited, for example, in the Plaintiffs' Summary of Proofs)

are not in dispute and they will not be recited in this opinion. The disputed question is the source of or the basis for the rejection.

opportunity suffered by a plaintiff or any chiropractor was caused by the boycott. For example, the AMA argues that many medical physicians have reached an independent conclusion that chiropractors have no value or impose harm on patients based on their own experiences, or on sources of such conclusions that are independent of the AMA (such as the 1975 Consumers Report articles, PX 7322), or on statements of or actions by the AMA and other defendants which are protected *Noerr–Pennington* activity. The AMA would have this court ask, if a medical physician refuses to associate with a chiropractor, who can say that the boycott was a contributing factor?

While it is difficult to say in any particular instance, a fair inference from the evidence is that the nature and extent of the boycott has influenced the thinking of medical physicians in their dealing, or refusing to deal, with chiropractors. The Committee on Quackery directly resulted from the AMA's concern that some medical physicians were cooperating with chiropractors and the AMA believed that this should be stopped. The Committee believed it was successful, and as I have already noted, I believe that the Committee's self-assessment was correct. It took the boycott to stop cooperation among medical physicians and chiropractors.[10] After the ethical proscription was lifted in 1980, some medical physicians did begin to associate with chiropractors. Certainly, Dr. Nelson and Drs. Epps and Dickey (current members of the Judicial Council who testified for the AMA) would not be taking referrals from chiropractors today, as they do (e.g., Tr. 2031), if Principle 3 were still on the books and if the AMA had not changed its chiropractic policy. It is important to note that these three doctors are well versed in the AMA's present policies since they were all called to testify about those policies.

I conclude that while the boycott was in full bloom it more likely than not affected individual decision-making by AMA members and other medical physicians in their relationships with chiropractors, including the plaintiffs. Until AMA members learn that the AMA's policies in fact have changed and that the reason for the change, as Dr. Nelson has testified (Tr. 2028–30), is that chiropractic has matured, the effects of the boycott, in my judgment, will continue to affect AMA members' decision-making with respect to association with chiropractors. From this I conclude that the rejections and lost opportunities suffered by the individual plaintiffs more likely than not were caused in significant part by the boycott. Thus, the individual plaintiffs have been personally harmed, and continue to be personally threatened, by a lack of association with members of the AMA caused by the boycott and the lingering effects of the boycott. The injury and the threatened loss are "fairly traceable" to the AMA's actions. *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556, 569 (1984); *Valley Forge Christian College v. American United,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Hope, Inc. v. College of DuPage,* 738 F.2d 797, 804 (7th Cir.1984). I reach this conclusion despite the fact that no AMA member confessed that she or he refused to associate with one of the plaintiffs because of the constraints of Principle 3, and despite the self-serving denials that Principle 3 had anything to do with a decision not to deal with one of the plaintiffs.

The evidence has also established a continuing injury to reputation which both Dr. Stano and Mr. Lynk testified would constitute an anti-competitive effect of the boycott. The activities of the AMA undoubtedly have injured the reputation of chiropractors generally. This kind of injury more likely than not was sustained by the four plaintiffs. In my judgment, this injury continues to the present time and likely continues to adversely affect the plaintiffs. The AMA has never made any attempt to publicly repair the damage the boycott did to chiropractors' reputations. There has been

---

10. Obviously, the boycott was not 100% successful and there has always been some cooperation among medical physicians and chiropractors.

no affirmative statement by the AMA to its members that it is ethical to associate with chiropractors. There has been no public announcement of what the AMA has argued in this courtroom in defense against an injunction, namely that chiropractic has changed and improved. I believe that until some of these things are said by the AMA to its members, plaintiffs and chiropractors generally will continue to suffer injury to reputation resulting from the boycott.

Finally, based on Dr. Stano's testimony, the plaintiffs have established a likelihood that their incomes have been diminished as a result of the boycott, and that such injury threatens to continue to this day. The AMA points out that the last data point utilized by Dr. Stano showed that chiropractors' income in 1984 exceeded that of podiatrists and optometrists. (Tr. 475.) That is correct, but the analyses done by Dr. Stano to predict income through 1986 showed that the projection was still lower than similar projections for podiatrists and optometrists. Thus, I conclude that the plaintiffs have demonstrated sufficient personal injury to obtain an injunction in this case.

■■■ The final question is whether the court will exercise its discretion and issue an injunction against any of the defendants who have been found guilty of a Section 1 violation. The AMA strenuously argued that no injunction is necessary since its present policies are in compliance with the antitrust laws; it has no intention of changing its present policies; most of the conduct relied upon by the plaintiffs occurred in the mid to late 1960s; and the AMA voluntarily has taken corrective action.

I agree that the AMA's present policies do not prohibit association with chiropractors. With respect to the specific corrective action taken by the AMA, I have already discussed the begrudging nature of Report UU and the continued use of the concept of "unscientific practices" in both Report UU and in the 1977 revised Opinions of the Judicial Council. Until Principle

3 was eliminated in 1980, Report UU and the revised opinions remained ambiguous due to the references to unscientific conduct. To this day, the AMA responds to requests for information on chiropractic by sending outdated anti-chiropractic literature. But the more important point for purposes of determining whether an injunction is necessary is the fact that in none of the AMA policies is there any affirmative statement that the boycott is over. An example of such an affirmative statement is that of the Illinois State Medical Society: "There are and should be no ethical or collective impediments to full professional association and cooperation between doctors of chiropractic and medical physicians, except as provided by law." The Opinion of the Judicial Council which the AMA relies on most heavily to show its new position on chiropractic, Opinion 3.01, is entitled "Nonscientific Practitioners." (DX 21077 at 13.) So the AMA member has to look under "Nonscientific Practitioners" to find out that it is permissible to associate with a chiropractor. In contrast, the 1969 Opinions had a separate section on optometrists, about whom the AMA at one time had very negative things to say, but today there is nothing similar on chiropractors. (Tr. 1964–65.) Another example is the AMA's acknowledgement of its changed thinking about osteopaths. In 1969 Opinions contained an opinion on osteopathy which states that "recognition should be given to the transition presently occurring in osteopathy." (PX 505.) A medical physician whose thinking on chiropractic was formed at least in part by the boycott has not been told affirmatively by the AMA that the boycott is off and that it is ethical for a medical physician to professionally associate with a chiropractor if she or he believes it is in the best interests of her or his patient.

The AMA also relies on the settlement agreements it entered into in several other lawsuits brought by chiropractors in Pennsylvania, New York, and Iowa.[11] In these agreements the AMA basically reaffirmed

11. The AMA also relies on the favorable results it received in other chiropractic litigation, but none of those results is binding here and there

are substantial differences among the various lawsuits that render comparison useless.

and reiterated its policy changes and agreed to not change those policies. In addition, Drs. Nelson, Epps, and Dickey, testified that the AMA has no plans to change its present policies on chiropractic. (Tr. 2005, 1939, 2959.) Some of the plaintiffs' witnesses, Dr. Freitag and Dr. James Winterstein, D.C., stated their agreement with and support of the current AMA policies. (Tr. 852–53, 294–95.) Finally, the AMA relies on the fact that the change in the AMA position, and the medical profession's criticism of that change in position, received wide publicity in both the medical and popular press in the late 1970s and early 1980s. From this the AMA concludes its members have been informed of the change in position.

In response to the AMA's argument that there is no evidence that suggests a return to its former policies, I need only refer to AMA's behavior in connection with the 1983 revision of the JCAH accreditation standards for hospitals. The AMA was forced to change its original position which was more favorable to chiropractors in response to criticism from its members and other medical societies. The AMA changed its position to satisfy its constituents, medical physicians, and it voted to approve the more restrictive accreditation standards. The fact that the AMA was forced to back away from its original position indicates to me that the AMA's present assurances are good only until the next chiropractic battle.

The plaintiffs note that in all of the settlement agreements executed by the AMA there is no admission of liability, and that in this case the AMA vigorously argues that its conduct is now and always has been legal. "The activities of the AMA relating to chiropractic and doctors of chiropractic have always been in compliance with antitrust laws...." AMA Motion for Summary Judgment, March 24, 1987, p. 10. This is a relevant factor.

I conclude that an injunction is necessary in this case. There are lingering effects of the conspiracy; the AMA has never acknowledged the lawlessness of its past conduct and in fact to this day maintains that it has always been in compliance with the antitrust laws; there has never been an affirmative statement by the AMA that it is ethical to associate with chiropractors; there has never been a public statement to AMA members of the admissions made in this court about the improved nature of chiropractic despite the fact that the AMA today claims that it made changes in its policy in recognition of the change and improvement in chiropractic; there has never been public retraction of articles such as "The Right and Duty of Hospitals to Deny Chiropractor Access to Hospitals"; a medical physician has to very carefully read the current AMA Judicial Council Opinions to realize that there has been a change in the treatment of chiropractors and the court cannot assume that members of the AMA pore over these opinions; and finally, the systematic, long-term wrongdoing and the long-term intent to destroy a licensed profession suggests that an injunction is appropriate in this case. When all of these factors are considered in the context of this "private attorney general" antitrust suit, a proper exercise of the court's discretion permits, and in my judgment requires, an injunction.

After reviewing the form of injunction proposed by the plaintiffs in connection with the motions for summary judgment, I informed the parties that regardless of the outcome of this case, I would not grant the sweeping form of injunction sought by the plaintiffs. As the defendants have suggested, the plaintiffs appear to want a forced marriage between the professions. Certainly no judge should perform that ceremony. Since August 27th, the form of permanent injunction proposed by the court has been discussed with the parties and modified to take some of the AMA's 1st amendment concerns into account, the Permanent Injunction shall be entered today.

B. *Liability of Remaining Defendants*

1. *General Legal Principles Applicable to Co-Conspirators*

] After the first trial, defendants JCAH, ACP, and AAOS appealed the denial of their motions for directed verdict. The Court of Appeals affirmed the denial of

those motions. The Court concluded that the evidence was sufficient to permit, but not require, the finder of fact to conclude that each defendant knew that concerted action in a scheme was contemplated and invited and that each acquiesced and participated in that scheme. "Such a finding would have provided sufficient footing for liability in this civil antitrust action. *See Theater Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 540, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954); *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 226–27, 59 S.Ct. 467, 474–75, 83 L.Ed. 610 (1939)." *Wilk,* 719 F.2d at 233.[12]

The defendants argue that *Monsanto v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), have clarified and limited the "conscious parallelism" doctrine of the cases relied upon in *Wilk.* In *Monsanto* the Supreme Court held that in order for the plaintiffs' case to survive a motion for summary judgment or for directed verdict, there must be evidence that tends to (1) "exclude the possibility" of independent action by the alleged conspirators, and (2) prove that the alleged conspirators had "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto,* 465 U.S. at 764, 768, 104 S.Ct. at 1473. Those standards were reaffirmed in *Matsushita,* where the Court noted:

> We do not mean to imply that, if petitioners had had a plausible reason to conspire, ambiguous conduct could suffice to create a triable issue of conspiracy. Our decision in *Monsanto Co. v. Spray–Rite Service Corp. ... establishes that conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy.*

(106 S.Ct. 16 1632 n. 21):

The standards of *Monsanto* and *Matsushita* must be met in this case. Also, un-

der general conspiracy law, a particular defendant's membership in the conspiracy must be proved by its own acts and declarations and not the acts or declarations of the alleged co-conspirators. *United States v. Jefferson,* 714 F.2d 689, 696 (7th Cir. 1983); *United States v. Santiago,* 582 F.2d 1128 (7th Cir.1978). Accordingly, the evidence relating to each remaining defendant will be analyzed to determine: first, if that defendant's own conduct shows membership in the conspiracy, secondly, whether the defendant has established the patient care defense and then, if pertinent, whether the plaintiffs are entitled to injunctive relief against the defendant.

One factual issue relates to all of the other defendants. The plaintiffs note that two years after the Committee on Quackery was formed, the Committee sent the AMA's 1966 chiropractic policy to 56 groups, including some specialty medical societies, to seek their cooperation in reminding their members of the ethical standards. (PX 550, 550A.) There was no evidence as to the identity of these groups. Plaintiffs argue that a reasonable assumption is that the co-defendants received this communication. There was no direct evidence that any of the co-defendants received this communication and I shall not infer receipt by any defendant.

### 2. Joint Commission on Accreditation of Hospitals ("JCAH")

#### (a) Activity through 1980

JCAH is a not-for-profit corporation for the purpose of setting standards and conducting a health care accreditation program in conjunction with those standards. JCAH members are the AMA, ACP, the American College of Surgeons (ACS), the American Hospital Association ("AHA"), and the American Dental Association. (PX 7130.) JCAH is governed by its Board of Commissioners. Twenty-one commissioners are appointed by the various members and those commissioners appoint

---

**12.** The appeal of the American Academy of Orthopaedic Surgeons from the denial of its post-trial motion was decided in a separate order.

The Court issued a similar finding against the Academy.

one public commissioner. (Tr. 3367.) The two dominant members are the AMA and former defendant AHA, each having seven commissioners for a total of 14 out of a total of 22 votes. (Tr. 3367.) ACS and ACP each has three commissioners. (Tr. 3367.) Commissioners appointed by a particular member generally are free to vote their conscience on any issue, but typically a commissioner is a strong organization man who became a commissioner after serving on the national policy board of the member organization. JCAH's power derives from the power of its member organizations. (Schlicke Dep. 129–30; DX 5006; PX 7169.) It would have difficulty surviving if it did not have the support of its powerful members. (*Id.*)

Participation by hospitals in the accreditation program is voluntary. (Tr. 1729, 1756; JCAH II 2.) However, obtaining accreditation is important to a hospital and loss of accreditation would be devastating. "Denial or loss of accreditation can close a hospital." (Schlicke Dep. 109–10).

As the hospital standard-setting organization, JCAH has the power to define and regulate the activities which take place in hospitals and to eliminate or frustrate competition from non-medical physician health care providers. (PX 7157.) From before 1958, JCAH had standards which provided that the hospital medical staff shall be limited to fully licensed physicians. (Tr. 3371.) It was not until 1970 that dentists were included.

On May 16, 1964, JCAH's director stated, in a column in the national newsletter of AHA, that the Commission viewed chiropractors as cultists and that any hospital that encouraged cultists to use its facilities in any way would "very probably be severely criticized and lose its accreditation." (PX 6.) This statement was later republished in a reference manual distributed to approximately 6,100 hospitals. (Sullivan Trial I Tr. 5306; PX 828.) At the time this statement was first published, the AMA Committee on Quackery was only five months old and the Committee had not yet begun its efforts to get other groups to support the AMA's policy on chiropractic.

There was no direct evidence that JCAH was acting in concert with the AMA in connection with the publication of the statement or its later distribution. The actions appear to be independent.

In 1970 JCAH completed a revision of its standards and published the *Accreditation Manual for Hospitals ("AMH")*. Standard X (drafted by the AMA) was included. (PX 72 at 32, PX 2266). Under this standard, the governing board of the hospital had to assure that medical staff members practice in an ethical manner. (JCAH II 6.) *AMH* included a source reference to the AMA's Principles and the American Dental Association's Principles of Ethics. (DX 72, p. 33.) The uncontradicted testimony was that JCAH's Board of Commissioners never discussed the subject of chiropractic and that the subject was never raised in connection with the 1970 revisions and the publication of *AMH*. (Tr. 1623–24.) I accept this testimony. No chiropractor participated in any way in the revision process despite extensive opportunity to participate. (Tr. 1586–90; Tr. 1761–63, 1804.) There was no evidence that JCAH adopted Standard X in connection with chiropractors or in furtherance of the AMA boycott.

Throughout the early 1970s, JCAH staff responded to several inquiries from hospitals and others about the role of chiropractors in hospitals by stating that the Commission would withdraw and refuse accreditation of a hospital that had chiropractors on its medical staff or that granted privileges to chiropractors. (PX 10A, 11A.) One of these letters specifically stated that such association would violate Principle 3. (PX 14A.) Another letter enclosed the article published by the AMA, "The Right and Duty of Hospitals to Exclude Doctors of Chiropractic." (PX 12B.) However, these letters were completely consistent with the then-existing accreditation standards. The fact that the letters were written is not surprising and is not convincing evidence that JCAH had joined the conspiracy against chiropractors.

Much of this correspondence was shared with the AMA and AHA, and there were communications between Dr. Donald L.

Kessler of JCAH and the AMA regarding chiropractic. (PX 12B.) In 1973 Dr. Kessler of JCAH cooperated with the AMA in connection with the distribution of "The Right and Duty of Hospitals to Exclude Chiropractors from Hospitals," which contained the statement that inclusion of chiropractors would threaten JCAH accreditation. (PX 12B.)

In 1974, the American Hospital Association was concerned that the inclusion of chiropractic under Medicare might mandate chiropractic services in health maintenance organizations. AHA was planning to meet with the AMA and JCAH to discuss this problem. (PX 9D.) The AHA interoffice memorandum that refers to the plan to meet with the AMA and JCAH is not the act or declaration of JCAH, however, and it cannot be considered by the court in determining the JCAH's membership in the conspiracy.

In 1977, after this lawsuit was filed, JCAH revised its standards to provide that medical staff membership shall be limited "unless otherwise provided by law" to fully licensed physicians and dentists. (Tr. 1639.) Also, all references to the AMA's Principles were deleted. (Tr. 1626; JCAH II–13.) JCAH responded to all further inquiries regarding chiropractors by advising that the issue was one of local law. (JCAH II Exhibits.) Thus, from 1977, JCAH's position was that if under local law a limited licensed practitioner could be on a medical staff, the hospital could allow such a practitioner to be on the medical staff without jeopardizing its accreditation. In 1979, JCAH amended its laboratory and radiology standards to provide that hospitals could, if permitted by law, grant non-physician and non-medical staff members access to diagnostic laboratory and radiology services. (Tr. 3368.) Many states have laws which deal with the question of which limited licensed health practitioners can be on hospital medical staffs or have hospital privileges. In 1980 JCAH amended *AMH* to delete Standard X. (Tr. 1625–27.)

Focusing on JCAH's conduct from 1964 through 1980, I find that it was undertaken independently of the AMA boycott.

JCAH's conduct during this period was consistent with its stated purpose of promoting high quality health care. (Tr. 3366.) From a time well before the AMA boycott, JCAH believed that only fully licensed physicians should be on medical staffs of hospitals. (Tr. 3371.) That belief was incorporated into the earliest standards and it was carried through 1980 except for the addition of dentists in 1970 and changes dictated by expanding state law. (JCAH II Exhibits.) At the most, the evidence establishes exchange of information among JCAH and the AMA and AHA on the subject of chiropractic. Undoubtedly, JCAH was manipulated by the AMA to promote and expand its boycott—getting JCAH to adopt Standard X is but one example—but the evidence falls far short of establishing a conscious commitment to the scheme on the part of JCAH.

I note that JCAH's standards were largely consistent with federal law. From 1966 on, the conditions of hospital participation under Medicare provided that members of the medical staff be qualified professionally and ethically, that participating hospitals assure that patients were admitted to the hospital only on the recommendation of a physician, that the medical staff be responsible for all medical care, that the hospital's bylaws contain provisions concerning professional ethics, and that laboratory and radiological services be performed only on the order of a physician. It was not until 1972 that the Medicare statute defined physician as including chiropractors, and even then there was some question whether the inclusion was for reimbursement for office services only or whether by including chiropractors within the definition of physician Congress was allowing chiropractors on medical staffs of participating hospitals. (PX 7283, p. 38.) The consistency between the JCAH standards and Medicare requirements is further evidence that JCAH was acting independently rather than in concert with the AMA.

(b) *Liability of JCAH Members for JCAH Standards*

Plaintiffs argue that even if JCAH was acting independently of the AMA boy-

cott, JCAH members are responsible for the actions of JCAH. Thus, if JCAH was acting to exclude chiropractors from hospitals, the JCAH members were acting in concert to exclude them. The plaintiffs' first theory is that the JCAH is the alter ego of each of its members. The evidence is simply insufficient to establish this theory. There is almost no evidence on the participation of the members in the creation and revision of JCAH standards prior to the 1983 revisions. The general evidence is that JCAH standards are created as a result of an elaborate deliberative process involving many organizations and public hearings. (Tr. 1586–90, 1761–63, 1804.) Chiropractors were not involved in the process despite the fact they could have elected to become involved. (*Id.*) There is no evidence as to how the commissioners appointed by the defendants voted in connection with revisions prior to the 1983 revisions. I reject the alter ego theory.

Next plaintiffs argue that mere membership in JCAH is evidence that the member was engaged in a conspiracy to violate the antitrust laws. Plaintiffs rely on *Phelps Dodge Refining Corp. v. F.T.C.*, 139 F.2d 393, 396–97 (2nd Cir.1943). The Court held that the circulation of a price list to members of a trade association put recipients on notice of illegal activities and provided a basis for imposing civil liability:

> Thus the issue is reduced to whether a member who knows or should know that his association is engaged in an unlawful enterprise and continues his membership without protest may be charged with complicity as a confederate. We believe he may. Granted that his mere membership does not authorize unlawful conduct by the association, once he is chargeable with knowledge that his fellows are acting unlawfully his failure to dissociate himself from them is a ratification of what they are doing. He becomes one of the principals in the enterprise and cannot disclaim joint responsibility for the illegal uses to which the association is put.

Others have followed this view. *Chain Institute v. F.T.C.*, 246 F.2d 231, 240 (8th Cir.1957); *Vandervelde v. Put & Call Bro-*

*kers and Dealers Assn.*, 344 F.Supp. 118, 155 (S.D.N.Y.1972); *Expert Electric Inc. v. Levine*, 554 F.2d 1227, 1235 (2nd Cir.1977) (noting *Phelps* rule in dicta) and 399 F.Supp. 893, 897–98 (S.D.N.Y.1975).

The membership-ratification theory articulated in *Phelps* has not retained the force of law. More recent cases have tended to require a greater showing to establish proof of conspiracy. See *Moore v. Boating Industry Associations*, 819 F.2d 693, 716 (7th Cir.1987), quoting T. Vakerics, *Antitrust Basics*, Sec. 6.13 at 6–37 to 6–38 (1985) ("There must ... be some evidence of actual knowledge of, and participation in, an illegal scheme in order to establish a violation of the antitrust laws by a particular association member."); *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 231–33 (9th Cir.1974) (to be liable, trade association member must have "knowingly, intentionally, and actively participated in an individual capacity in the scheme"); *Hunt v. Mobil Oil Corp.*, 465 F.Supp. 195, 231 (S.D.N.Y.1978), *aff'd*, 610 F.2d 806 (2d Cir.1979) (association, even coupled with knowledge of wrongful conduct by other members, does not create liability); *James Julian Inc. v. Raytheon Co.*, 557 F.Supp. 1058, 1065 (D.Del.1983) (membership in trade association, including attendance at meetings, will not give rise to inference of conspiracy). By minimizing the importance of a member's knowledge of his association's wrongful conduct, these Courts have reformulated the membership-ratification doctrine virtually out of existence. *Kline*, 508 F.2d at 231. This emasculation of the *Phelps* rule is consistent with the Supreme Court's decisions in *Monsanto* and *Matsushita*. Accordingly, I conclude that mere membership in JCAH does not make each member liable for the acts of JCAH, and that the acts of JCAH prior to the 1983 revisions were not the result of a conspiracy among the JCAH members.

#### (c) *1983 Revisions of JCAH Standards*

The 1983 revisions of the JCAH standards have already been described and discussed in connection with the AMA. The 1983 revisions liberalized the prior stan-

dards regarding admission to medical staffs of, and allowance of hospital privileges to, limited licensed practitioners (which include chiropractors). (Tr. 1779.) The revisions were prompted by changes in state law which recognized the increased significance of limited licensed practitioners in the health care field. (Tr. 1750, 1788–89.) Despite the liberalization achieved by the revisions, the plaintiffs claim that the JCAH members' insistence that the medical staff of each accredited hospital must have an executive committee, the majority of which had to be medical and osteopathic physicians, is evidence that the conspiracy against chiropractors continued into 1983. (Plaintiffs do not claim that the 1983 JCAH standards violate the antitrust laws).

The evidence supports the conclusion that the 1983 revisions concerning the medical staffs of hospitals were the act of the defendants who are JCAH members. (PX 7268, 7101, 7117, 7141, 7154, 7181.) These members aggressively sought the revisions and the commissioners appointed by them appear to have been instructed on how to vote on the issue. (E.g., PX 7102–03, 7117, 7120, 7146.) There was also some evidence that the defendant members were concerned about chiropractors and the possibility of competition from chiropractors in the hospital setting. However, I reject plaintiffs' conclusion that the 1983 revisions constitute evidence that the boycott or conspiracy against chiropractors continued into 1983.

The proposed liberalization of the standards governing limited licensed practitioners created the theoretical possibility that a medical staff of a hospital could become dominated by limited licensed practitioners. (Tr. 1774.) That in turn created a discussion of whether JCAH ought not insure that patient care in acute care hospitals be controlled by fully licensed physicians. (*Id.*) The overwhelming response was that patient care and medical staffs must remain under medical and osteopathic physician control. (Tr. 1774–76.) Although the revision process was wide-open in that many drafts were distributed, public hearings were held, and comments were received and considered, no chiropractor participated in the process. (*Id.*) No argument was made with respect to the proper role of chiropractors, if any, in the hospital setting. No complaint was made on behalf of chiropractors that the requirement of an executive committee of the medical staff would work against the admission of chiropractors to hospitals.

The evidence supports the conclusion that the JCAH members were acting to assure that responsibility for patient care in acute care hospitals remained in the hands of medical and osteopathic physicians (Tr. 2517–18), and that this was an appropriate goal for JCAH. Today, acute care hospitals treat patients who are very sick or in need of surgery. Generally they are patients who require treatment with drugs or surgery, that is treatment by fully licensed physicians. (Tr. 1774.) A chiropractor may have a patient in a hospital who is in need of chiropractic treatment (e.g., Tr. 909), and there may be some justification for chiropractic services in hospitals (e.g., Tr. 811–12), but these facts do not justify hospital standards less rigorous than the ones adopted by JCAH in 1983. The evidence supports no conclusion other than that patient care in acute care hospitals, and the medical staffs of acute care hospitals, ought to be under the control of fully licensed physicians rather than limited licensed practitioners. I am persuaded that the JCAH members were not acting to prevent chiropractors from being admitted to hospitals or obtaining hospital privileges.

Current federal regulations have similar requirements. Under the current Medicare conditions of participation, if a medical staff has an executive committee, a majority of the members of the committee must be doctors of medicine or osteopathy, and the responsibility for organization and conduct of the medical staff must be assigned only to an individual doctor of medicine or osteopathy. 42 CFR Sec. 482.22(b)(2), (3). Even though a chiropractor may have responsibility for a patient (but under the regulations only with respect to "treatment by means of manual manipulation of the spine to correct a subluxation demonstrat-

ed by x-ray to exist"), a physical examination and medical history of that patient must be done by a medical or osteopathic physician. 42 CFR Sec. 481.11(c)(5).

Under current JCAH standards, a hospital may grant chiropractors medical staff membership, clinical privileges, admission privileges, and access to diagnostic services without fear of loss or threatened loss of JCAH accreditation. Hospitals may select chiropractors to serve on the medical staff executive committee without affecting their accreditation. (Tr. 1779.) The hospital's governing board has the responsibility and ultimate authority for making individual medical staff appointments and delineations of clinical privileges, even though the governing board must resolve any differences it has with the medical staff. (Tr. 1814–15.) Since 1983, hospitals in fact have been allowing chiropractors on medical staffs. (Tr. 1824.) The uncontradicted evidence is that the current JCAH standards are reasonable because of the severity and complexity of conditions treated in the hospital setting, and plaintiffs' expert, Dr. Freitag, so testified. (Tr. 834–35.)

Since I have found that JCAH's acts before the 1983 revisions were independent of the AMA boycott and were not the acts of its members, and that the 1983 revisions are not evidence that the conspiracy against chiropractors continued into 1983, I find that the plaintiffs have failed to prove that JCAH was a member of the conspiracy. Accordingly, judgment shall enter for JCAH.

### 3. *American College of Physicians ("ACP")*

ACP never had a code of ethics. In 1984, it published the American College of Physicians Ethics Manual. (PX 8051.) The document was not a code or set of regulations but "a modest effort to address major contemporary issues that confront every physician in practice" (PX 8051 at 1) and an effort "to stimulate reasonable debate so as to widen the area of agreement on medical ethics shared by the lay public, physicians, and others who take part in health care" (*Id.* at 2). With respect to relation-

ships with other health professionals, the Manual states that

> there are no rigid guidelines, but rather each situation must be approached in a context of the realities of the practice environment and state law.... Degrees of responsibility must be dictated by the competence of the allied health professionals and the nature of the actual practice setting.... The patient should be told about the variety and availability of such service, which can be facilitated through cooperation between physicians and licensed allied health professionals.

(*Id.* at 19–20.) With respect to "non-scientific medical systems," the Manual states that a patient's request for care "outside the orthodox medical system" warrants "the physician's considerate attention" and that the physician "should not abandon the patient if he should elect to try a non-scientific remedy" but that the physician "should not participate in such treatment." (*Id.* at 14–15.) The Manual states nothing about chiropractic or about what remedies are or are not "scientific." It appears to leave the individual physician free to make his own judgments as to the kinds of treatment he should participate in and his relations with other licensed health practitioners.

Importantly, ACP never adopted the AMA's Principles and never required its members to subscribe to those principles. (Barondess Trial I at Tr. 5829.) The only reference to ethics in ACP's governing provisions was the statement in its constitution and bylaws that the purpose of the ACP included "preserving the history and perpetuating the best tradition of medicine and medical ethics." (PX 1812 at 1.)

Prior to the filing of this lawsuit in 1976, ACP considered the subject of chiropractic only once. On July 31, 1974, Daniel S. Ellis, M.D. wrote to Dr. Edward Rosenow, Jr., the executive vice president of ACP, stating that he had been asked by the Chairman of the Committee on Quackery, Dr. Ballantine, to see if ACP would send a statement to the National Institute of Neurological Diseases and Stroke ("NINDS"), which was conducting a congressionally

mandated study of chiropractic. (PX 1816.) Dr. Rosenow must have agreed to do it because on September 4, 1974, he wrote to Donald B. Tower, M.D., Acting Director of NINDS. (PX 347.) The letter stated in part:

> Although the Board of Regents of the College will not meet until November to take any specific action on the inclusion of chiropractic in Medicare and Medicaid, I am sure that they would be most distressed to find that the government was considering the inclusion of this non-scientifically based form of practice under Medicare and Medicaid.... The College, I am sure, would agree with the statement on chiropractic adopted by the American Medical Association's House of Delegates in 1966....

(PX 347.) The letter then quoted the AMA's policy statement. (*Id.*) The ACP Board of Regents, however, did not later adopt the AMA's policy. (Barondess Trial I at Tr. 5839.)

 ACP argues strongly that this letter is protected under the *Noerr–Pennington* doctrine. I agree. The letter was written to a governmental agency in connection with a government project (the study of chiropractic) and it is also apparent from the letter that Dr. Rosenow was acting under the misapprehension (incredible as that may be) that chiropractic had not yet been included in Medicare and Medicaid. That, in fact, had happened a year earlier. Nevertheless, Dr. Rosenow appeared to believe that the letter was written to influence government action on the issue of the inclusion of chiropractic into Medicare and Medicaid. Even if the letter was not protected, it clearly reveals that it expresses Dr. Rosenow's opinion as to what action the Board of Regents might take in the future and it is not the act of ACP endorsing the AMA chiropractic policy statement. Furthermore, ACP had no member on the Committee on Quackery and there is no evidence that ACP had knowledge of the activities of the Committee.

After this lawsuit and several other chiropractic lawsuits were filed, Dr. Jeremiah Barondess, the president of ACP, wrote to ACP members, principally about the defense of the lawsuits. (Barondess Trial I at Tr. 5834–36.) Dr. Barondess viewed the lawsuits as an effort by chiropractors to gain legitimacy. The letter states in part:

> Our concern about these suits does not relate to their merit; indeed, we feel strongly that they have no merit whatever.... All have agreed that the issue that is paramount is the health of the population of this country, and that the only ethical position for the College to take in relation to these efforts by the chiropractors is to resist them as strongly as possible.

(PX 1440.) The letter also discusses various settlements of chiropractic lawsuits by the AMA and other co-defendants and seeks the support of the membership in the defense of this lawsuit. (*Id.*) This letter is protected under the *Noerr–Pennington* doctrine.

In September of 1978, there was a meeting of the Board of Governors of the ACP (the Board of Governors was not the policy making body—that was the Board of Regents). (Barondess Trial I at Tr. 5829–32, 5853; Moser Dep. 113–14; Tr. 2528, 2540–41.) At the meeting the Board heard and accepted a report by the ad hoc committee appointed to suggest what might be done at the chapter or regional level to promote the College's policy toward chiropractic. (PX 1441.) The minutes of the meeting reflect that:

> The Committee agreed unanimously that ACP should be concerned about and oppose any action which would include chiropractic among the scientifically-based modes of medical care and which would give chiropractors direct access to the diagnostic facilities of hospitals.

(PX 1441 at 33.) The Board of Governors then adopted the following resolution:

> (1) the Regents and ACP staff should keep the Governors informed of development in the North Penn case and related actions;
>
> (2) the Governors should remain alert to efforts of chiropractors to gain access to radiographic and clinical labo-

ratory diagnostic facilities in their regions and keep ACP headquarters informed of such developments;

(3) the membership of the College should be informed by special mailing regarding the status of the North Penn and Wilk cases and be provided with background information regarding the strategy of intervention;

(4) the aforementioned mailing to the membership should include information on the nature of chiropractic;

(5) the Governors should discuss these issues with the College membership in their regions and prepare them for the possibility of a voluntary assessment to support the legal defense;

(6) the Governors should consider contacting the Attorney General or Medical Practice Committee of their state legislature regarding the efforts of chiropractors to gain access to certain diagnostic facilities, raising the question of the legality of such arrangements;

(7) the Governors should review the current roster of AMA Trustees and consider, if appropriate, discussing the North Penn agreement and related topics with them on an individual basis;

(8) the Governors should alert colleagues in other disciplines to the efforts of chiropractors to gain access to radiographic and clinical pathology diagnostic facilities; and

(9) the Governors and the College members in their regions should discuss these matters with their county and state medical societies and with their representatives to the House of Delegates of the AMA.

(PX 1441 at 33–34.)

Many parts of the resolution relate to matters protected under the *Noerr–Pennington* doctrine, but not all. Nevertheless, in carefully reviewing the list, there is no call for the participation of ACP or its members in the AMA's boycott against chiropractors or ACP's own boycott. I see no evidence in the resolution of any agreement to join the AMA conspiracy. The

activity is independent of the AMA's boycott. Moreover, the resolution was never implemented (Barondess Trial I at Tr. 5829–32, 5853; Moser Dep. 113–14) and there is no evidence that ACP members were called upon to cooperate in effectuating ACP's "policy" on chiropractic.

Finally, ACP was one of four medical specialty societies which prepared a Status Report on the Chiropractic Lawsuits in 1978. (PX 1069.) The report was distributed to ACP members. I held during the trial that the report is protected activity but that to the extent it contains relevant admissions of fact, it is admissible. The report does contain an admission that Principle 3 forbade association with chiropractors. (PX 1069 at 4.) This admission is relevant to a medical specialty society, such as the American Academy of Orthopaedic Surgeons, which had adopted the AMA's Principles. It is not relevant to ACP which had not adopted the Principles (Barondess Trial I at Tr. 5829) and which did not have a medical ethic similar to Principle 3.

ACP is a member owner of JCAH. (PX 7275.) However, I have already found that the members are not legally responsible for JCAH's accreditation standards before 1983, and that the actions of the JCAH members in connection with the 1983 revisions of the hospital standards do not constitute evidence of participation in a conspiracy against chiropractors. Thus, ACP's membership in JCAH is not material.

On the basis of the evidence, I conclude that plaintiffs have failed to establish ACP's participation in the boycott or conspiracy. Plaintiffs have also failed to establish a separate conspiracy between ACP and its members. Accordingly, judgment shall enter in favor of ACP.

### 4. American Academy of Orthopaedic Surgeons ("AAOS")

From early on, the exact date is not known, AAOS required its members to pledge compliance with the AMA's Principles of Medical Ethics. (PX 7408, 1804.) This required compliance with Principle 3.

(*Id.*) Prior to January 30, 1981, again the exact date is not known, AAOS's bylaws were amended to delete this requirement. (DX 6046–49.)

In 1966, Dr. David B. Stevens, a Kentucky orthopedic surgeon, sent a copy of the Kentucky Medical Society's anti-chiropractic resolution to Robert Youngerman, a lawyer with the AMA's Department of Investigation. (PX 478; Tr. 2170–71.) Stevens also sent Youngerman a draft of a resolution to be proposed by Stevens to the AAOS. (*Id.*) Youngerman proposed less "monopolistic" language which would not change the "basic intent." (*Id.*) Stevens adopted Youngerman's proposed changes and deleted references to the "elimination" of chiropractic. (PX 478A.) Some argument could be made that at this point Stevens and the AMA are conspiring and that only they knew that the true intent of the resolution was to eliminate and contain chiropractic (which, according to Youngerman, would indicate a monopolistic intent).

On January 16, 1967, there was a meeting of the AAOS resolutions committee. (PX 1153) Stevens and three others proposed affirmance of the AMA anti-chiropractic policy. Youngerman was an "official guest" at the meeting and "was able to offer the committee helpful advice and suggestions." (*Id.; Tr.* 2170–72.) The AMA's 1966 anti-chiropractic policy statement was presented. (*Id.*) AAOS adopted a resolution affirming the AMA's policy statement that chiropractic was an unscientific cult and constituted a hazard to health. (PX 1153.) The resolution also requested the Executive Committee of AAOS to establish activities to alert the professional and lay public of the hazards of unscientific practice and to participate in the medical profession's program to reduce such dangers to the public health. (*Id.*) Although there was no explicit reference to the prohibition of professional association with chiropractors, the reasonable inference is that AAOS knew that a significant part of the medical profession's program to reduce chiropractic dangers to the public health was the prohibition against association with chiropractors. This inference is based on Youngerman's participation at the meeting of the

resolutions committee and it is also further supported by the admission made by AAOS in the Status Report on Chiropractic Lawsuits dated October 27, 1978. (PX 1069.) In this report AAOS acknowledged that Principle 3 proscribed all voluntary association with chiropractors and subscribed to the belief that this interpretation of Principle 3 should not be changed.

AAOS argues that the passing of the 1967 resolution was protected *Noerr–Pennington* activity because the AAOS resolution was obtained by the Committee on Quackery in connection with the Committee's legislative activities. In support of this argument, AAOS relies on a portion of Dr. Stevens' testimony (Tr. 2196–98.) during which he is responding to a series of leading questions which assumed that at the time Stevens was presenting his resolution to AAOS he was also a member of the Committee on Quackery, and that his activity was on behalf of the Committee on Quackery. The evidence in this record does not support that assumption. Dr. Stevens testified that he joined the Committee in 1967 (Tr. 2053), but he did not state it was as early as January. He frankly could not recall. The Court of Appeals in *Wilk* referred to the fact that Stevens joined the Committee on Quackery in 1968. During the first trial AAOS's counsel informed the court that Dr. Stevens joined the Committee on Quackery one and one-half years *after* the AAOS resolution was adopted. (See p. 866 of the first trial transcript.) AAOS cannot argue in one trial that Stevens joined the Committee on Quackery in 1968 and in this trial that he joined the Committee before January 17, 1967. There is no factual basis for the *Noerr–Pennington* argument made before this court. There is no evidence that AAOS was acting in furtherance of any political goals when it adopted its anti-chiropractic policy.

In 1972, a member of AAOS complained to the Academy about pro-chiropractic legislation in California (PX 1154) and AAOS wrote to the AMA stating "we are aware of your stated position in this matter." (PX 1158.) This shows an awareness of

the AMA's position but not of any particular activities.

In 1974, there was some activity involving AAOS and the ACS regarding the study of chiropractic being undertaken by the NINDS. (PX 1160.) I have already held, in connection with ACP, that attempts to influence NINDS, a governmental agency, was protected activity. Also in 1974, a neurosurgeon told the American College of Chiropractic Orthopedists that Principle 3 prevented him from speaking to the group and he cancelled his commitment to speak. (PX 790.) There is no evidence, however, that this doctor was acting this way because of his membership in the AMA or in AAOS.

On February 23, 1986, AAOS formally rescinded its anti-chiropractic resolution. (PX 7121.) It included the resolution among several other "obsolete" resolutions and the membership was asked to approve the deletion of these "obsolete" resolutions. There was no affirmative statement that the policy had been rescinded or was wrong.

During the entire relevant period AAOS never attempted to enforce the AMA's Principles against any members. However, the bylaws did have discipline procedures. (PX 2408.) Dr. Freitag, an orthopedic surgeon who testified on behalf of the plaintiffs, regularly associates with chiropractors. (Freitag Tr. 806, 811.) He had some concerns about his association with chiropractors in connection with passing his specialty boards, but he in fact encountered no difficulty. (Freitag Tr. 837.) Several of the plaintiffs have professionally associated with orthopedic surgeons. (Pedigo Tr. 722.)

In a separate order dated October 25, 1983, the Court of Appeals affirmed the trial court's denial of AAOS's motion for directed verdict at the end of the first trial, holding as follows:

> However, the evidence permitted the jury to find: that there was communication between the AMA and AAOS on the subject of chiropractic; that this communication revealed acquiescence by AAOS in the AMA view that chiropractic is un-scientific cultism; and that by adopting the essence of the 1966 AMA policy statement, in combination with AMA's Principle 3, AAOS endeavored to discourage medical doctors from professional association with chiropractors.

735 F.2d 217 (1983).

█ On the basis of the evidence, I find that AAOS knowingly joined the conspiracy. Whether it adopted Principle 3 of the AMA's Principles intending to boycott chiropractors is not decisive. When AAOS adopted the 1966 AMA policy statement branding chiropractors as unscientific cultists, it knew that it was prohibiting association with chiropractors. This is clear from the 1978 Status Report. (PX 1069.) AAOS consciously participated in the conspiracy. The evidence clearly establishes that AAOS was not acting independently.

AAOS relied on the same evidence as the AMA on the patient care defense. That evidence is inadequate to establish that defense.

█ The question of whether an injunction should issue is not so easily answered. AAOS took no corrective action until 1986, many years after the corrective action taken by the AMA. Orthopedic surgeons are direct competitors of chiropractors and they directly benefited from the boycott. However, the actions of AAOS which tied it to the AMA conspiracy occurred in 1966. Apart from protected activity, it did not actively participate in the boycott after 1967. Most of the facts which led the court to enjoin the AMA simply are not present in the evidence against AAOS. I conclude that there is no likelihood that AAOS would renew any boycott or conspiracy against chiropractors. I find that an injunction should not issue against AAOS.

### 5. American College of Radiology ("ACR")

#### (a) Participation in AMA Conspiracy

In the mid–1970s, ACR included 12,000 of the 14,000 radiologists in the country. (Stronach Dep. 12–13.) ARC conditions membership on adherence to the AMA's Principles (which are printed in ACR's by-

laws) and the Principles of Ethical Radiological Practice. (PX 1147.) The Principles of Ethical Radiological Practice have contained Principle 3 (identical to the original AMA Principle 3) since the early 1940s. (Tr. 2355.)

Under the bylaws, the Board of Chancellors may discipline any member of the College for violation of its principles. (PX 106 at 11.) Any member who for reasons of moral turpitude or unethical practices ceases to be a member of the AMA or of any country, state, or provincial medical society shall have her or his status as a member of the College referred to the Board of Chancellors for possible action. (*Id.*) No radiologist has ever been disciplined for associating with chiropractors. (Tr. 2356; Becker Dep. 191.)

In the late 1960s, the AMA requested that ACR pass a resolution regarding chiropractic. (PX 108.) The AMA supplied ACR with materials on chiropractic for this purpose. (*Id.*) ACR in fact adopted a resolution but it was less aggressive than the AMA wanted. ACR informed the AMA that:

This was done on the feeling that the College would like to offer something which would be helpful but not necessarily legally hazardous, since there would seem to be little gain in having the College sued as apparently the AMA has been sued lately on this kind of issue.

(PX 108C.) The actual resolution passed in 1968 (and again in 1969) stated that ACR advised the people of the United States that they regard the use of radiation for medical purposes by chiropractors as an unwarranted use of radiation without potential for medical gain to balance the potential risk.

(PX 114B.) The policy continued by urging state radiation protection agencies and others to "warn the public against the misuse and unsafe uses of x-rays on patients by chiropractors." (*Id.*) The ACR members

and other medical societies. Although this resolution was not published in any way designed to reach "the people of the United States," I view it as protected activity.

A revised version of the resolution was passed by the ACR Council in 1975. This resolution was strongly worded and it explicitly prohibited the submission of x-rays to chiropractors—even at the request of a patient:

[S]ubmitting x-ray films or other medical records to a chiropractor or to a patient to be conveyed to a chiropractor, constitutes a tacit endorsement of chiropractic as a legitimate healing art and as such is not consistent with the Principles of Medical Ethics of the American Medical Association.

(PX 120.) This resolution was again amended in 1981 to permit radiologists to provide previously taken x-rays to a chiropractor or a patient. Radiologists were advised as follows:

In deciding whether to make previously-taken x-rays, copies thereof, or x-ray reports available to a chiropractor or a patient, a radiologist should take into account applicable laws, hospital rules and regulations, and the best interests of the patient.

(DX 21059.) This change was made in response to changing state laws and changes in the rules of some hospitals which required radiologists to turn over previously-taken x-rays to the patient or any person designated by the patient.[13] Except in cases where turning over x-rays is required by law or hospital rule, the 1981 resolution may not be all that significant since the current Chairman of the Board of Chancellors of ACR testified at trial that in his view it was not in the patient's best interest to turn over a previously taken x-ray or x-ray report to a chiropractor. (Tr. 2347–49.)

Throughout the mid–1970s, ACR informed its members in response to member

---

**13.** Despite the existence of this resolution, ACR staff occasionally advised inquiring radiologists that it would be appropriate to make prior x-rays available to chiropractors at the request of patients. (PX 122A, 123, 124A, 126.)

inquiries that it was unethical to associate with chiropractors because chiropractic was unscientific. (PX 115–18, 124A, 126, 128A, 129.) In these responses, explicit reference was made to the AMA's Principles. (PX 128A, 129.) During the 21–year period from 1960 to 1981, there were only ten such letters written by ACR staff. However, most of them were in 1973 and 1974. In the past six or seven years, every ACR response to an inquiry about chiropractic included a statement to the effect that notwithstanding the College's anti-chiropractic policy, the radiologist should make an individual choice in deciding to associate with chiropractors. (DX 21060; Tr. 2355–56.)

ACR vigorously opposed the AMA's settlement of some chiropractic lawsuits and the changes in AMA's policies on chiropractic. In the 1978 Status Report on Chiropractic Lawsuits the ACR acknowledged that Principle 3 of the AMA's Principles forbade all association with chiropractors and it condemned any change in the AMA's policies. (PX 1069 at 10.) Radiologists also opposed the revision of the AMA's Principles in 1980 which deleted Principle 3. (Tr. 2363–64.)

In opposing the plaintiff's settlement with the Illinois State Medical Society, ACR publicly informed its members of its position on chiropractic:

**The College's Position on Chiropractic**

The College has always held that consultations or professional association between chiropractors and radiologists are not in the best interest of patient care and are not optimal radiologic practice, and that, therefore, chiropractors should not be provided privileges to request radiological services in the hospital. Any decision to provide hospital privileges to chiropractors would be difficult to reconcile with the increasingly rigorous credentiality of medical physicians.

In 1981, the College Council adopted a policy statement criticizing chiropractic use of radiation. It states that the ACR "regards the prescription and use of radiation by chiropractors as unwarranted and without likelihood of significant ben-

efit to patients." The policy statement notes that radiological studies for medical diagnosis and evaluation should only be requested or conducted by individuals who are scientifically trained and licensed physicians. "There is no scientific evidence to justify the use of radiation by health care providers for non-medical purposes," according to the statement. In addition, it condemns "the use of radiation for promotional purposes by chiropractors or others," and counsels radiologists, when deciding whether to make reports of previously performed radiological studies available to a chiropractor or a patient, to "take into account applicable laws, hospital rules and regulations, and the best interests of the patient."

The Principles of Ethical Radiological Practice also address the question of professional association with chiropractors. Principle three states that "Physicians should practice a method of healing founded on a scientific basis; and they should not voluntarily associate professionally with anyone who violates this principle."

Chiropractic theory and practice is based upon unscientific and unproven tenets. Furthermore, there is no comparability between the comprehensive training and clinical experience of a physician and the limited training and experience of a chiropractor.

A radiologist accepts referrals from other physicians on the premise that the physician's judgment in requesting an x-ray examination is valid. This premise is not valid in the case of chiropractors, who are not equipped by training or experience to assess the risk/benefit ratios of such examinations. Radiologists provide a verbal or written consultation to attending physicians on the premise that they are able to assess these matters and to understand and act upon their findings. This premise also is invalid in the case of chiropractors.

The College has another concern. And that is that chiropractors historically have engaged in inappropriate advertis-

ing and promotion of x-ray exposure, including advertising of free x-rays to patients, use of full spine x-rays, and unnecessary follow-up or progress studies. A number of examples of chiropractic misuse of radiation have been brought to the attention of the College over the years. The College feels it is inappropriate for trained and qualified medical radiologists to participate in such a use of radiation.

The College's policy position on chiropractic and its ethical principles serve as guidelines or advice to members of the college and are not intended in any way to preclude the individual radiologist from exercising his best professional judgment concerning patient care. No member of the College has ever been disciplined or otherwise censured for electing to associate professionally with chiropractors. (DX ACR 21059.)

▆▆▆ Plaintiffs characterize statements such as the one just quoted as a renewed call to radiologists to boycott chiropractors. The College argues that it is entitled to state its policy to its members in a statement describing this litigation and the College's position in this case and that the statements are protected under the *Noerr–Pennington* doctrine. I agree, but the statement of the policy is admissible to prove that this was the ACR policy (a fact not disputed by ACR at trial).

ACR's policies can directly affect hospitals. JCAH accreditation standards for hospitals require that a hospital's radiology equipment and services be controlled by a medical physician radiologist. (PX 72 at 159.) Almost all radiologists are members of ACR. (Stronach Dep. 12–13.) Radiologists would heavily influence any hospital decision relative to chiropractors, whether it be admission to the medical staff or more limited privileges such as access to the radiology department equipment or services. (Stronach Dep. 16–17.) The testimony of Sister Bonaventure, the President of Resurrection Hospital in Chicago, was enlightening. She has been the chief executive officer of a large hospital for many years (Tr. 1153) and she would rely on the decision of the radiologists in determining whether the services of the radiology department would be made available to chiropractors. (Tr. 1160–61.) ACR is opposed to any hospital privileges for chiropractors. As ACR's Executive Director admitted, radiologists following the policy of the ACR effectively bar chiropractors from the use of hospital radiology departments or services. (Stronach Dep. 16–17).

All of the radiologists who testified, in person or by deposition, testified that they had made individual decisions in deciding not to associate with chiropractors but a "number of radiologists testified that they followed ACR's advice." (Post-trial Submission of ACR at Paragraph 21). A reasonable inference from the evidence is that most radiologists do not associate with chiropractors. About half of all chiropractors own their own x-ray equipment and they purchase this equipment because radiologists in private practice and hospitals refuse to deal with chiropractors.

The common perception among radiologists was that ACR's canons of ethics proscribed as an unethical practice the taking or interpretation of x-rays by radiologists on referral from chiropractors in all circumstances. For example, the New York chapter of the College issued a resolution in May of 1977 urging ACR to consider amendment of the ethical canon so as to permit association between radiologists and chiropractors in states in which chiropractors were licensed. (PX 2209.) In New Jersey the State Board of Medical Examiners promulgated a regulation that required all radiologists in New Jersey to accept referrals from chiropractors. (PX 7088 at 2.) On October 1, 1976, ACR's Maine chapter issued a resolution unanimously supporting the policies of the AMA and ACR regarding doctors of chiropractic. (PX 1137.) And there was no question what those policies were.

On August 30, 1978, ACR circulated to all its state chapters a Pledge of Membership which required members to agree to abide by the Principles of Medical Ethics of the AMA and the Principles of Radiological Ethics of ACR. (PX 1147.) There is some

question whether this pledge actually was signed by radiologists but there is no doubt that it was circulated to all state chapters and a reasonable inference is that the pledge was distributed to and executed by some radiologists.

ACR challenges the sufficiency of the evidence on the conspiracy issues, claiming there is not sufficient evidence that ACR was in conspiracy with the AMA to boycott chiropractors. I find the evidence strong. In 1968, ACR passed a resolution "to be helpful" to the AMA. (PX 108C.) ACR had the AMA's literature on chiropractic, including the AMA's 1966 anti-chiropractic resolution, and had to know that the AMA believed chiropractic to be unscientific and association between medical physicians and chiropractors to be unethical. (PX 108.) ACR had its own Principle 3 and it too opposed association with chiropractors because "the use of radiation for medical purposes by doctors of chiropractic [is] unwarranted." (PX 106, 114B.) ACR staff conferred with AMA staff before adopting the 1968 resolution.

Beginning in 1973, after chiropractic had been included in Medicare, ACR began to work with the AMA on matters relating to chiropractic. (PX 113, 151.) ACR staff specifically referred inquiries on chiropractic to Doyl Taylor. (*Id.*) Mr. Taylor was a fervent, highly motivated person. He had a single goal: to eliminate chiropractic as a profession. (E.g., PX 464; Taylor Vid. Dep.) The Assistant Executive Director of ACR described Taylor's department at the AMA as "a very active department concerning the problems that medicine encounters with chiropractors."

In 1973 ACR advised its members that the College concurred in the opinion of the AMA that "any association with cultists by physicians in the practice of medicine is considered unethical." In 1974 ACR stated: "The American College of Radiology concurs with the American Medical Association. *Our stand is:* that physicians should not have professional relationships

with the practice of chiropractic medicine, and such relationships would be considered by either society as unethical." (PX 117; emphasis added). (See also, e.g., PX 114–18, 120, 123, 124A, 126, 156, 128A, 129, 1137, 1818–19, 1109, 1147, Stronach Dep. 16–17.) See citations *supra* and see also PX 7090–91, 7274, 7131, 7191.)

■ ACR argues that there is no indication that it had any specific knowledge of, let alone involvement in, the activities of the AMA's Committee on Quackery. Such specific knowledge is not necessary. ACR had knowledge of the boycott. (PX 1069.) It had a copy of the AMA's anti-chiropractic resolution condemning chiropractic as unscientific and ACR knew, as any reasonable person would have known, that under Principle 3 association with unscientific practitioners (chiropractors) was unethical. ACR also argues that the mere existence of an unscientific practitioner ethical standard, such as Principle 3, is not evidence of a conspiracy. That is correct. But when a medical society that has such an ethical standard brands a competing profession as unscientific, that tells its members that association with such practitioners is unethical. See citations *supra* and see also (PX 7090–91, 7274, 7131, 7191.) This combination of action may be considered in determining whether ACR entered into a conspiracy with the AMA.

Plaintiffs' evidence establishes more than mere independent action on the part of ACR. The evidence demonstrates a conscious commitment to the AMA boycott and participation in the boycott. I find that ACR was a member of the AMA conspiracy.

(b) *Patient Care Defense*

■ ACR maintains that it has a patient care defense that is different from the patient care defense of the other defendants due to the unique consultative role of a diagnostic radiologist.[14] The College described that unique role in its Memorandum Concerning Patient Care Defense at 4–5:

> practice whereby radiologists, using various imaging techniques, attempt to detect pathology in the patient.

---

**14.** Therapeutic radiology, the treatment of cancer patients with radiation, is not involved in this suit. Diagnostic radiology is a consultative

Diagnostic radiologists provide *consultative* services only—*i.e.*, they conduct radiologic examinations only upon referral from other medical doctors, and they report their findings to the referring physicians, to be used as a component of their diagnoses and further treatment of the patients. Radiologists frequently do not even meet their patients and rarely report findings directly to the patients.... This consultative role means that radiologists must rely on their referring physicians, both for initial guidance as to the patient's condition, and for follow-through on the patient's diagnosis and treatment after the radiologic procedure. Hence, a radiologist is critically dependent on the knowledge and competence of his cooperating colleagues for the proper care of the radiologist's patients.[4]

\* \* \* \* \* \*

[4] Even though a radiologist performs his task fully competently, he or she (and the patient) face a risk that the patient may nevertheless not receive proper treatment, because the primary provider: (1) gives the radiologist inadequate information to determine what radiologic procedures are indicated; (2) misunderstands the radiologic findings; (3) fails to treat the patient in accordance with those findings; or (4) fails to initiate other diagnostic steps necessary to identify the patient's problem.

I accept ACR's claim that it was acting out of a genuine belief that chiropractors misuse and abuse radiation. Half of all chiropractors own x-ray equipment and it is the prevailing practice to x-ray each new patient. Some chiropractors routinely take repeat follow-up x-rays. Regrettably, the current use of x-rays is attributable in part to Medicare regulations which provide that chiropractors may be reimbursed for chiropractic treatment of "subluxations demonstrated by x-ray to exist." The better view is that a chiropractic subluxation cannot be seen in an x-ray, but chiropractors undoubtedly continue to use x-rays so that they or their patients may qualify for Medicare reimbursement.

There was substantial evidence of radiation abuse—both historic and current—by chiropractors. (DX 6011, 6012, 1299–1302, 1304–07, 7000–01.) Some chiropractors, including one of the plaintiffs, routinely take full spine x-rays despite the fact that such x-rays very likely are unnecessary and exposure to radiation is substantially increased. (DX 6007.) Some chiropractors, again including one of the plaintiffs, fail to use gonadal shields when x-raying patients in their procreation years. (Tr. 1022.) Some chiropractors use the offer of free spine x-rays to obtain new business. (DX 7001, 6014.) There has been recent recognition in chiropractic literature of the abuse of radiation by chiropractors. (DX 6007, 6016, 6017.)

ACR's concern about abuse of radiation has not been limited to chiropractors. The College regularly has chastised medical physicians and radiologists about overuse and misuse of radiation. (Tr. 2345.) So I conclude that ACR was genuinely concerned about the subject and that its concerns about radiation abuse were objectively reasonable. However, to the extent ACR has to establish an objectively reasonable concern about chiropractic generally, it relies on the same evidence as the AMA and the same negative conclusion would apply. Notably, most of ACR's anti-chiropractic activity occurred in the mid–1970s when, according to the AMA's position at trial, chiropractic was growing and changing. Today ACR maintains that chiropractic is unscientific and yet the AMA witnesses are in disagreement, claiming now that at least some chiropractic manipulations are scientific. For these additional reasons, ACR has not established the "objectively reasonable" standard.

Radiologists' concern over chiropractic abuse of radiation has been the dominant motivating factor in ACR's policy on chiropractic. As medical physicians, radiologists have an affinity for their fellow professionals, and this could account in part for ACR's willingness to participate in the AMA boycott. Also, medical physicians currently are radiologists' principal source of business and radiologists could be keen to support their suppliers in a boycott against their suppliers' competitors. This would be true even if chiropractors were an alternative source of business to radiologists because the record established that even in the absence of the boycott chiro-

practors would not become a large source of business to radiologists. It would be in radiologists' interests to support their fellow medical physicians. but these competitive impulses, while present, did not, in my opinion, dominate ACR's motivation.

The final element in the patient care defense, whether the least restrictive means have been utilized, has not been established by ACR. ACR joined in a boycott to prevent all association between chiropractors and medical physicians, not just between chiropractors and radiologists. ACR's beliefs about chiropractic misuse of radiation cannot support such a boycott. Accepting as given the nature of radiological consultative services as described by the defendant, ACR could have advised its members to distinguish between the services requested of a chiropractor rather than advocating a total boycott. For example, if a chiropractor requested a certain x-ray (such as a full spine x-ray) and the radiologist was concerned that there was no medical justification for the eradiation exposure, the radiologist could discuss the issue with the referring chiropractor or simply refuse the patient.[15] If a radiologist became concerned that his report would not be properly interpreted by the chiropractor, the report could be made more explicit. Radiologists already advise medical physicians if they believe that a referral to another medical specialist is appropriate, and similar explicit advice could be given to a chiropractor. It would be a foolhardy chiropractor who would ignore a radiologist report, for example, that there was a possible cancer pathology and the patient should be referred to an oncologist for further treatment.

The patient is far better off with this result than being treated only by a chiropractor who does not have access to the kind of sophisticated, expensive radiological equipment available to radiologists.[16] The radiologists argue that if the patient chooses to go to a chiropractor instead of a medical physician, she or he must take the consequences and one of those consequences is lack of association between chiropractors and radiologists. That is not much solace to the patients who make 10,000,000 visits per year to be treated by chiropractors licensed by the fifty states to render treatment.

Next the radiologists argue that their actions were "least restrictive" because they only occasionally admonished a member of the College not to associate with chiropractors and it was done in private correspondence between the College and the member who sought advice. But the members knew about Principle 3 and it was well known that the College's policy was that association between radiologists and chiropractors was unethical. The College does not have to take the final step of advising the membership against association with chiropractors. That conclusion flows from the synergy created from the existence of the ethical prohibition against association with unscientific practitioners and the knowledge that the College considered chiropractors unscientific practitioners. I conclude that ACR's participation in the AMA conspiracy was not the least restrictive means of achieving ACR's legitimate patient care goals. Accordingly, I find that ACR has failed to establish the patient care defense.

Based on a recent Settlement Agreement between the plaintiffs and the ACR, no additional findings or actions regarding the ACR need to be made.

### ORDER

Based on the findings of fact and conclusions of law set forth in this opinion, the

---

15. Certainly not all x-rays requested by a chiropractor are useless. Chiropractors as well as medical physicians routinely take x-rays for leg length measurements (Tr. 2413) and back pain syndrome and such x-rays easily could be taken by a radiologist without risking harm to the patient.

16. This kind of equipment generally is available only at hospitals. It is equipment that is not owned by radiologists, but access to the equipment is, as described above, in the control of the radiologists who are members of the hospital's medical staff. (Stronach Dep. 16–17, Tr. 2426.) So a radiologist in that position at a hospital may, by declining to associate with chiropractors, deprive all patients of chiropractors access to that equipment. (Stronach Dep. 16–17.)

case is dismissed against defendants JCAH, ACP, AAOS, and Dr. Sammons, and an injunction shall issue against defendant AMA. The ACR has recently settled with plaintiffs and is dismissed.

It is so ordered.

## PERMANENT INJUNCTION ORDER AGAINST AMA

The court conducted a lengthy trial of this case in May and June of 1987 and on August 27, 1987, issued a 101 page opinion finding that the American Medical Association ("AMA") and its members participated in a conspiracy against chiropractors in violation of the nation's antitrust laws. Thereafter an opinion dated September 25, 1987 was substituted for the August 27, 1987 opinion. The question now before the court is the form of injunctive relief that the court will order.

As part of the injunctive relief to be ordered by the court against the AMA, the AMA shall be required to send a copy of this Permanent Injunction Order to each of its current members. The members of the AMA are bound by the terms of the Permanent Injunction Order if they act in concert with the AMA to violate the terms of the order. Accordingly, it is important that the AMA members understand the order and the reasons why the order has been entered.

### The AMA's Boycott and Conspiracy

In the early 1960s, the AMA decided to contain and eliminate chiropractic as a profession. In 1963 the AMA's Committee on Quackery was formed. The committee worked aggressively—both overtly and covertly—to eliminate chiropractic. One of the principal means used by the AMA to achieve its goal was to make it unethical for medical physicians to professionally associate with chiropractors. Under Principle 3 of the AMA's Principles of Medical Ethics, it was unethical for a physician to associate with an "unscientific practitioner," and in 1966 the AMA's House of Delegates passed a resolution calling chiropractic an unscientific cult. To complete the circle, in 1967 the AMA's Judicial Council issued an opinion under Principle 3 holding that it was unethical for a physician to associate professionally with chiropractors.

The AMA's purpose was to prevent medical physicians from referring patients to chiropractors and accepting referrals of patients from chiropractors, to prevent chiropractors from obtaining access to hospital diagnostic services and membership on hospital medical staffs, to prevent medical physicians from teaching at chiropractic colleges or engaging in any joint research, and to prevent any cooperation between the two groups in the delivery of health care services.

The AMA believed that the boycott worked—that chiropractic would have achieved greater gains in the absence of the boycott. Since no medical physician would want to be considered unethical by his peers, the success of the boycott is not surprising. However, chiropractic achieved licensing in all 50 states during the existence of the Committee on Quackery.

The Committee on Quackery was disbanded in 1975 and some of the committee's activities became publicly known. Several lawsuits were filed by or on behalf of chiropractors and this case was filed in 1976.

### Change in AMA's Position on Chiropractic

In 1977, the AMA began to change its position on chiropractic. The AMA's Judicial Council adopted new opinions under which medical physicians could refer patients to chiropractors, but there was still the proviso that the medical physician should be confident that the services to be provided on referral would be performed in accordance with accepted scientific standards. In 1979, the AMA's House of Delegates adopted Report UU which said that not everything that a chiropractor may do is without therapeutic value, but it stopped short of saying that such things were based on scientific standards. It was not until 1980 that the AMA revised its Principles of Medical Ethics to eliminate Principle 3. Until Principle 3 was formally eliminated, there was considerable ambiguity about

the AMA's position. The ethics code adopted in 1980 provided that a medical physician "shall be free to choose whom to serve, with whom to associate, and the environment in which to provide medical services."

The AMA settled three chiropractic lawsuits by stipulating and agreeing that under the current opinions of the Judicial Council a physician may, without fear of discipline or sanction by the AMA, refer a patient to a duly licensed chiropractor when he believes that referral may benefit the patient. The AMA confirmed that a physician may also choose to accept or to decline patients sent to him by a duly licensed chiropractor. Finally, the AMA confirmed that a physician may teach at a chiropractic college or seminar. These settlements were entered into in 1978, 1980, and 1986.

The AMA's present position on chiropractic, as stated to the court, is that it is ethical for a medical physician to professionally associate with chiropractors provided the physician believes that such association is in the best interests of his patient. This position has not previously been communicated by the AMA to its members.

**Antitrust Laws**

Under the Sherman Act, every combination or conspiracy in restraint of trade is illegal. The court has held that the conduct of the AMA and its members constituted a conspiracy in restraint of trade based on the following facts: the purpose of the boycott was to eliminate chiropractic; chiropractors are in competition with some medical physicians; the boycott had substantial anti-competitive effects; there were no pro-competitive effects of the boycott; and the plaintiffs were injured as a result of the conduct. These facts add up to a violation of the Sherman Act.

In this case, however, the court allowed the defendants the opportunity to establish a "patient care defense" which has the following elements:

(1) that they genuinely entertained a concern for what they perceive as scientific method in the care of each person with whom they have entered into a doctor-patient relationship; (2) that this concern is objectively reasonable; (3) that this concern has been the dominant motivating factor in defendants' promulgation of Principle 3 and in the conduct intended to implement it; and (4) that this concern for scientific method in patient care could not have been adequately satisfied in a manner less restrictive of competition.

The court concluded that the AMA had a genuine concern for scientific methods in patient care, and that this concern was the dominant factor in motivating the AMA's conduct. However, the AMA failed to establish that throughout the entire period of the boycott, from 1966 to 1980, this concern was objectively reasonable. The court reached that conclusion on the basis of extensive testimony from both witnesses for the plaintiffs and the AMA that some forms of chiropractic treatment are effective and the fact that the AMA recognized that chiropractic began to change in the early 1970s. Since the boycott was not formally over until Principle 3 was eliminated in 1980, the court found that the AMA was unable to establish that during the entire period of the conspiracy its position was objectively reasonable. Finally, the court ruled that the AMA's concern for scientific method in patient care could have been adequately satisfied in a manner less restrictive of competition and that a nationwide conspiracy to eliminate a licensed profession was not justified by the concern for scientific method. On the basis of these findings, the court concluded that the AMA had failed to establish the patient care defense.

None of the court's findings constituted a judicial endorsement of chiropractic. All of the parties to the case, including the plaintiffs and the AMA, agreed that chiropractic treatment of diseases such as diabetes, high blood pressure, cancer, heart disease and infectious disease is not proper, and that the historic theory of chiropractic, that there is a single cause and cure of disease was wrong. There was disagreement between the parties as to whether chiropractors should engage in diagnosis.

There was evidence that the chiropractic theory of subluxations was unscientific, and evidence that some chiropractors engaged in unscientific practices. The court did not reach the question of whether chiropractic theory was in fact scientific. However, the evidence in the case was that some forms of chiropractic manipulation of the spine and joints was therapeutic. AMA witnesses, including the present Chairman of the Board of Trustees of the AMA, testified that some forms of treatment by chiropractors, including manipulation, can be therapeutic in the treatment of conditions such as back pain syndrome.

**Need for Injunctive Relief**

Although the conspiracy ended in 1980, there are lingering effects of the illegal boycott and conspiracy which require an injunction. Some medical physicians' individual decisions on whether or not to professionally associate with chiropractors are still affected by the boycott. The injury to chiropractors' reputations which resulted from the boycott has not been repaired. Chiropractors suffer current economic injury as a result of the boycott. The AMA has never affirmatively acknowledged that there are and should be no collective impediments to professional association and cooperation between chiropractors and medical physicians, except as provided by law. Instead, the AMA has consistently argued that its conduct has not violated the antitrust laws.

Most importantly, the court believes that it is important that the AMA members be made aware of the present AMA position that it is ethical for a medical physician to professionally associate with a chiropractor if the physician believes it is in the best interests of his patient, so that the lingering effects of the illegal group boycott against chiropractors finally can be dissipated.

Under the law, every medical physician, institution, and hospital has the right to make an individual decision as to whether or not that physician, institution, or hospital shall associate professionally with chiropractors. Individual choice by a medical physician voluntarily to associate professionally with chiropractors should be governed only by restrictions under state law, if any, and by the individual medical physician's personal judgment as to what is in the best interest of a patient or patients. Professional association includes referrals, consultations, group practice in partnerships, Health Maintenance Organizations, Preferred Provider Organizations, and other alternative health care delivery systems; the provision of treatment privileges and diagnostic services (including radiological and other laboratory facilities) in or through hospital facilities; association and cooperation in educational programs for students in chiropractic colleges; and cooperation in research, health care seminars, and continuing education programs.

An injunction is necessary to assure that the AMA does not interfere with the right of a physician, hospital, or other institution to make an individual decision on the question of professional association.

**Form of Injunction**

1. The AMA, its officers, agents and employees, and all persons who act in active concert with any of them and who receive actual notice of this order are hereby permanently enjoined from restricting, regulating or impeding, or aiding and abetting others from restricting, regulating or impeding, the freedom of any AMA member or any institution or hospital to make an individual decision as to whether or not that AMA member, institution, or hospital shall professionally associate with chiropractors, chiropractic students, or chiropractic institutions.

2. This Permanent Injunction does not and shall not be construed to restrict or otherwise interfere with the AMA's right to take positions on any issue, including chiropractic, and to express or publicize those positions, either alone or in conjunction with others. Nor does this Permanent Injunction restrict or otherwise interfere with the AMA's right to petition or testify before any public body on any legislative or regulatory measure or to join or cooperate with any other entity in so petitioning or testifying. The AMA's membership in a recognized accrediting association or society shall not constitute a violation of this Permanent Injunction.

3. The AMA is directed to send a copy of this order to each AMA member and employee, first class mail, postage prepaid, within thirty days of the entry of this order. In the alternative, the AMA shall provide the Clerk of the Court with mailing labels so that the court may send this order to AMA members and employees.

4. The AMA shall cause the publication of this order in JAMA and the indexing of the order under "Chiropractic" so that persons desiring to find the order in the future will be able to do so.

5. The AMA shall prepare a statement of the AMA's present position on chiropractic for inclusion in the current reports and opinions of the Judicial Council with an appropriate heading that refers to professional association between medical physicians and chiropractors, and indexed in the same manner that other reports and opinions are indexed. The court imposes no restrictions on the AMA's statement but only requires that it be consistent with the AMA's statements of its present position to the court.

6. The AMA shall file a report with the court evidencing compliance with this order on or before January 10, 1988.

It is so ordered.